UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------------------X   <u>COMPLAINT</u>

CALVIN HARRIS,

                                                     Plaintiff,                      DOCKET NO.:

          -against-                                               3:17-cv-932 (DNH/DEP)

TIOGA COUNTY, TIOGA COUNTY DISTRICT ATTORNEY'S OFFICE,
FORMER TIOGA COUNTY DISTRICT ATTORNEY GERALD KEENE,
UNIDENTIFIED JANE/JOHN DOE #1-10 TIOGA COUNTY
EMPLOYEES, NEW YORK STATE POLICE INVESTIGATOR STEVEN   JURY TRIAL
ANDERSEN, NEW YORK STATE POLICE INVESTIGATOR SUSAN   <u>DEMANDED</u>
MULVEY, NEW YORK STATE POLICE INVESTIGATOR LESTER,
UNIDENTIFIED JANE/JOHN DOE #11-20 NEW YORK STATE POLICE
EMPLOYEES, and BARBARA THAYER,

                                        Defendants.
------------------------------------------------------------------------------------------X

## <u>COMPLAINT</u>

     1.    Plaintiff Calvin Harris was charged, prosecuted, and tried three times, over an eleven year period for the death of his ex-wife who went missing on September 11, 2001. Mr. Harris was targeted, hunted, and pursued; he was incarcerated for more than three and a half years, removed from his four small children, demonized by scathing wide-spread local and national media coverage that caused him to be reviled in his close-knit upstate community, suffered the loss all of his businesses and associated enterprises, and, even after his acquittal, continues to be labeled a murderer as a result of public statements made by the District Attorney and law enforcement throughout the 15-year history of his case.

### <u>Introduction</u>

     2.    On September 11, 2001, Mr. Harris's estranged wife, Michele Harris, went missing.

1

3.     Her car was found at the end of the very long driveway that led to the family's home.

4.     The police searched the family home as well as the extensive wooded property surrounding the home.

5.     After a week of unfettered access to the Harris property, police discovered droplets of blood on a door, several small bloodstains on a rug, and trace amounts in the garage, together constituting less than 10 drops.

6.     Over the next half-decade, police conducted numerous foot, canine, and helicopter searches involving sonar, radar, heat-sensing, and night-vision equipment.

7.     They followed and tracked Plaintiff's children.  They enlisted the help of all of Michele Harris's friends, family, and acquaintances to try to gather incriminating information about Plaintiff.  And yet, during the years that passed, they obtained no evidence implicating Plaintiff in Michele Harris's disappearance.

8.     Nevertheless, in 2005, District Attorney Gerald Keene, whose wife had been one of Michele Harris's divorce attorneys in her matrimonial action against Plaintiff, made the decision to indict Mr. Harris.

9.     Together, the Defendants fabricated evidence, falsified evidence, falsely arrested and maliciously prosecuted Mr. Harris.

10.     This civil rights action seeks damages arising out of Defendants' violation of the rights secured by the First, Fourth and Fourteenth Amendments of the United States Constitution pursuant to 42 U.S.C. §1983, arising under the laws of the State of New York, and arising out of Defendants' defamatory statements.

2

**JURISDICTION AND VENUE**

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, over claims arising under 42 U.S.C. § 1983.

12.     Supplemental jurisdiction over Plaintiff's state law claims exists pursuant to 28 U.S.C. § 1367(a).

13.     Venue is proper in the Northern District of New York under 28 U.S.C. § 1391(b), because that is the judicial district in which the Plaintiff resides.

14.     Mr. Harris has complied with the requirements of New York General Municipal Law Section 50-i by making and serving a notice of claim on the County Attorney for the County of Tioga on August 19, 2016, within the time required by New York General Municipal Law Section 50-e.  More than thirty days have elapsed since the service of that notice.

15.     On November 4, 2016 a 50-h hearing was held pursuant to New York's General Municipal Law § 50-h.

**JURY DEMAND**

16.     Pursuant to the Seventh Amendment of the United States Constitution, Plaintiff requests a jury trial on all issues and claims set forth in this Complaint.

**PARTIES**

17.     Plaintiff, Calvin ("Cal") Harris is a resident of Tioga County in the State of New York.

18.     The individually named Tioga County Defendants were at all times employed by the County of Tioga and were acting in their capacity as Tioga County employees at all times relevant and pertinent to Plaintiff's complaint.

19.     At all times relevant to this complaint, Tioga County District Attorney Defendants were duly appointed and acting as District Attorneys and/or agents of the Tioga County District Attorney, acting under color of state law, within the scope of their employment, pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the County of Tioga and the State of New York.

20.     Defendant County of Tioga is a body politic and corporate empowered to exercise home rule.

21.     The County of Tioga County Legislature, the County's policymaker, has delegated final policymaking authority for the supervision and control of the County of Tioga District Attorney's Office to the duly appointed District Attorney of the County of Tioga.

22.     The individually named New York State Police Investigators were at all times employed by the State of New York and were acting in their capacity as State of New York employees at all times relevant and pertinent to Plaintiff's complaint.

23.     At all times relevant to this complaint, the individually named and unidentified New York State Police Investigator Defendants were duly appointed and acting under color of state law, within the scope of their employment, pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the State of New York.

24.     Defendant Barbara Thayer is a resident of Tioga County, who at all times relevant to this complaint, was acting as a willful participant in joint activity with the State actors and/or their agents.

## **FACTS**

25.     In September of 2001, the Plaintiff, Calvin Harris, lived at 381 Hagadorn Hill, Spencer, New York with his four young children.

26.     Michele Harris was Plaintiff's wife and the mother of their four children.

27.     The couple had separated and divorce proceedings were nearing resolution; although estranged, Michele Harris still continued to come to the family home during the early morning hours to take care of the children when Mr. Harris went to work.

28.     On September 11, 2001, Michele Harris did not return home; her car was found parked on the street at the end of the long driveway that led to the family's home.  She was never seen again.

## The Investigation Begins

29.     The police searched the family home as well as the extensive wooded property surrounding the home.

30.     The efforts to find Michele's remains or evidence of her murder on the Harris property were staggering, involving on-the-ground and aerial surveillance, grid searches, canine searches, heat sensing technology, numerous digs, and diving and use of sonar in the lakes and ponds on and near the property.  So thorough was the search, that a 500 year-old native-American jaw bone was unearthed. Yet the searches of the property revealed no trace of Michele, nor any evidence of tracks, recently-disturbed soil, bloody clothing, or anything else that would suggest foul play.

31.     Similarly, no traces of blood or bodily fluids were found in any of Calvin Harris's vehicles. And while trace amounts of dried blood stains – only a few drops – were found in the kitchen and garage areas of the Harris home, they could not be dated.

## Investigation Focuses on Cal Harris

32.     During the years that passed, no additional evidence implicating Calvin Harris in his ex-wife's disappearance was obtained.

33.     Realizing that it was "now or never" and that "the case wasn't getting any better" (as Defendant Investigator Lester was quoted in a 48 Hours Mystery, A Time to Kill segment http://www.cbsnews.com/news/48-hours-mystery-a-time-to-kill-13-02-2010/), the Defendants set out to compile a case against Calvin Harris.

Fabricated Evidence and Withholding the Truth

Defendant Thayer

34.     In doing so, they found in Barbara Thayer, a willing and able participant who was only too happy to join the ranks of law enforcement.

35.      Thayer had worked for the Harris family cleaning the home and caring for the children.

36.     The Investigator and Prosecutor Defendants used and groomed Thayer.

37.     She was the witness who could and would help them frame Cal Harris; she in turn, willfully collaborated with law enforcement to create the tale of Cal Harris as the cold-blooded killer.

38.     When it became apparent that Thayer's initial and truthful statements to law enforcement were harmful to their case, the Defendant Investigators and Defendant District Attorney manipulated her to change her story.

39.     For instance, according to a journal Thayer kept, she had made an entry indicating that she began to clean out Michele's belongings from the family home while Cal was outside the home playing with the children.

40.     This statement was not particularly helpful, so Thayer's story was changed. Instead, she lied for the Defendants and claimed that Cal, being heartless and showing no remorse, began disposing of Michele's belongings and discarding sentimental marital keepsakes.

6

41.     Thayer even held a tag sale to publicly display all of the family keepsakes she claimed Cal was discarding.

42.     It was clear that the Defendants were controlling her actions as Defendant Mulvey conveniently came to the tag sale and gained possession of a commemorative wedding plate. This plate became evidence used against Cal in an attempt to show that he lacked remorse and was carelessly discarding marital mementoes.

43.     The Defendants also had Thayer lie to Cal Harris in order to gain access to his home and belongings; using her to surreptitiously lead them through the Harris home, identifying items to be seized for DNA testing and possible evidence.

44.     A significant piece of exculpatory evidence was the telephone record of a call made from the Harris home to Michele's cell phone on the morning she disappeared.  Cal Harris had called Michele's cellphone looking for her because he had to get to work and she was not home, as she should have been, to watch the children.  Knowing that this was significant – if Cal had truly killed Michele, he would know where she was and would not have been calling her or looking for her – Thayer jumped in at Defendants' behest and lied – stating that she made the call from the family home.

45.     This lie of Thayer's is clear evidence that the Defendants persuaded her to fabricate her testimony.  Previously, Thayer had unequivocally denied ever making a telephone call from the Harris home that morning.  And, she made this specific denial in a statement documented by law enforcement.

### The Blood Evidence

46.     The Defendants' whole case against Cal Harris hinged on the blood.  But to make that relevant, they had to prove that (1) the blood was deposited as a result of homicidal force; (2) the blood was recent; and (3) the blood was Michele's.  They knew that they could not prove any of these things, and some were affirmatively contradicted by other proof available to the Deefendants.  So they concealed the exculpatory evidence from the defense, and fabricated evidence to support their theory.

#### Defendant Keane knew that there was an innocent explanation for the blood droplets in that area

47.     Months prior to Michele's disappearance, she had cut her hand outside of the garage of the family home.  The location and small quantity of blood was consistent with her walking through the garage and into the kitchen to clean and bandage her hand.  This incident was reported to her divorce attorney, Betty Keane, the wife of Defendant Keane.[1]  It was incorporated into a family court petition that she prepared, which was filed with the Court.  And it was known by Defendant Gerald Keane, who was given the entire matrimonial file by Michele's divorce attorneys.

48.     Defendant Gerald Keane subsequently claimed the file was "privileged" when subpoenaed by the defense.

49.     Moreover, during a meeting with blood spatter expert Henry Lee, Defendant Keane questioned Lee about whether the blood could have been deposited from a cut finger.  Lee stated that it could, but the defense would need to prove there was a cut finger – the jury would demand that the defense prove this regardless of the burden of proof.  Defendants Keane,

---

[1] Through Michele's matrimonial attorneys, Defendant Keane became personally involved in the case on September 12, 2001 – within hours of Michele being reported missing – and possibly even prior to the State Police.

Mulvey, Andersen all laughed at this (*see* http://www.cbsnews.com/news/48-hours-mystery-a-time-to-kill-13-02-2010/), 48 Hours Outtakes).

50.     Notably, throughout the litigation, defendants fought hard to prevent the defense from obtaining the matrimonial file, to prevent them from obtaining the exculpatory 48 hours outtakes, and to prevent the jury from learning of the cut hand.

51.     They proceeded on a theory that the blood must have been the product of Mr. Harris bludgeoning his wife, although this was contrary to the information imparted to them by their expert and by the very small quantity of blood, which was inconsistent with a bludgeoning.

### *The People knew they could not prove the recency of the blood, and physically altered evidence to attempt to do so and then concealed their alteration from the defense*

52.     There is no scientifically valid way to date blood based on its color, and the Defendants knew this.  Nevertheless, they proceeded on a theory that the blood was bright red, and therefore, fresh.

53.     To this end, they presented photographs to the grand jury and the trial jury showing the "red" drops of blood at the scene, along with testimony that red means recent.

54.     Not only was the scientific conclusion improper and impermissible, but the photographs introduced into evidence had been "altered" by the State Police, (as admitted by Defendant Keane during a meeting with Henry Lee), by "enhancing the color" to make them 10 shades redder than the originally developed prints.

55.     The original, unaltered photographs of the blood drops were developed and constituted discovery material which the District Attorney Defendant had the obligation to preserve and provide to the defense under New York law. Defendants destroyed these photographs.  They also concealed from the defense, the judge, and the jury, that the photographs introduced into evidence as their primary evidence had been altered and color enhanced.

### *The Defendant Investigators Altered the Crime Scene*

56.     Defendant Investigators altered the crime scene before taking pictures of the blood droplets by smearing and swabbing the individual droplets and altering their shape.

57.     They then misrepresented to the jury that the photographs were accurate depictions of the untouched scene, and elicited expert testimony that the shape of the drops permitted conclusions that they were "medium velocity spatter" caused by a blow.

### *Defendant District Attorney did not prove the droplets were Michele's blood, but misrepresented to the jury that they had*

58.     Defendant District Attorney used only presumptive LMG testing on the swabs taken from the stained areas.  This showed the drops might be human blood, animal blood, meat drippings, vegetative matter, or various household chemicals.

59.     Without using confirmatory tests -- although they were available -- Defendant District Attorney conducted DNA testing on the swabs, finding Michele's DNA on some.  The DNA test they used, however, did not identify the cellular source of the DNA as skin, blood, saliva, etc.  Moreover, the test was human specific; thus it would not register any profile from another animal species' genetic material.

60.     Thus, as the Defendant District Attorney knew, their results were consistent with drops of animal blood or vegetative matter, deposited in an area where Michele had walked barefoot (in fact, her changing room was near the kitchen alcove where the drops were found; and numerous droplets of dog blood were found in the garage from a family pet with mange) -- this would equally result in a positive presumptive test for blood and a DNA match to Michele, although it would not be her blood.

61.    Nevertheless, the Defendant District Attorney falsely and knowingly presented "scientific" testimony to the grand jury and petit juries that the droplets were "Michele's blood," when, in fact, the science simply did not permit such conclusion.

### Witness Jerome Wilczynski

62.    Another witness procured and groomed by the Investigator Defendants and presented by the prosecutors was Jerome Wilczynski, Michele Harris's hairdresser, who gave an extensive statement to Trooper DelGiorno on September 25, 2001, approximately two weeks after Michele's disappearance.

63.    Wilczynski reported information about Cal and Michele's relationship, including a telephone conversation he overheard wherein Cal Harris purportedly told Michele to drop the divorce proceedings or he would make it very difficult for her.

64.    The Defendants put this witness on the stand to testify that he overheard Cal Harris threatening Michele that she better drop the divorce proceedings or he would kill her and make her disappear.

65.    The Defendants were aware that Wilczynski had given an extensive statement to Trooper DelGiorno (and Trooper Phillips who was also present), that this statement was in fact documented in the police paperwork as Lead 240 and, that Wilczynski made no mention of Cal Harris threatening to kill Michele Harris or cause her disappearance.

66.    Nevertheless, the Defendants ignored the witness statement given to a fellow law enforcement official and instead carefully crafted specific questions to elicit testimony that Wilczynski barely recalled speaking with Trooper DelGiorno.

67.    Defendants also elicited testimony from Wilczynski denying that he ever told DelGiorno about the telephone call he overheard even though it was documented in the police Lead Sheet 240.

<u>Failure to Investigate the Culpability of Stacy Stewart and Chris Thomason</u>

68.    The Defendants failed to pursue the evidence that existed and that pointed to the culpability of Michele's boyfriend at the time, Stacey Stewart.

69.    The evidence concerning Stewart was so persuasive that it caused the court to vacate the jury's verdict and order a new trial.

70.    The Defendants did not question these suspects, did not speak with their friends or their family; they did not conduct any thorough or timely searches of the suspects or of their property.

71.    The statements that these individuals did provide to law enforcement were riddled with inconsistencies and demonstrable lies.

72.    Their involvement in Michele's disappearance was suspected by their friends and co-workers, who flagged them to police.  They had no alibis, and, to the contrary, law enforcement had evidence that both men were out with Michele on the night she disappeared, and that shortly thereafter, they burned bloody clothing in Stewart's burn pit.

73.    Two separate witnesses had seen and reported that a man matching Stewart's description with a truck matching Stewart's truck was at the bottom of Michele's driveway with a woman matching Michele's description in the early morning that she disappeared.

74.    The Defendants did not promptly seek to obtain a warrant to search either man's house or property -- or even ask for their consent to do so.  Nor did they conduct any surveillance of the men following the disappearance.  They focused only on trying to find, acquire, and build

12

proof of Cal's guilt, and on other suspects for the sole purpose of "excluding" them, as clearly stated in the Police Lead Sheets.

## The Prosecution

75.     Although, the investigation failed to turn up any evidence, the prosecution of Calvin Harris persisted.

76.     The case against him was strung together with fabricated evidence and false testimony that the prosecution fed to the press to inflame the passions of the public.

77.     This tragic loss of a mother of four young children remains unanswered to this day because an investigation that should have taken place never did.

78.     Consistent with the misconduct, the first indictment was dismissed by the court based upon the prosecutor's conduct of "intentionally" presenting inadmissible evidence to the grand jury, telling the grand jurors that there was a background "story" that would be related to them after the grand jury was concluded and, informing the grand jurors that, as a matter of law, the prosecutor had already determined that there was enough evidence to warrant a true bill. *See People v. Harris*, 15 Misc. 3d 994 (2007).

79.     The People re-presented the case to a different grand jury and the case proceeded to trial in May of 2007.  After a lengthy trial, Plaintiff was found guilty of the one count of murder in the second degree.

80.     Prior to sentencing, Plaintiff's counsel filed a motion pursuant to CPL § 330.30 to set aside the verdict based upon new eyewitness evidence of a blond-haired woman seen at the foot of the Harris's driveway on the morning of September 12, 2001, standing next to a young man with dark hair, a muscular build and a Chevrolet pickup truck.

81.     The description of the woman matched Michele Harris and the description of the man and vehicle matched Stacey Stewart.

82.     On November 2, 2007, the court vacated the conviction based upon this newly discovered evidence.

83.     The People appealed the decision and the appellate court affirmed the vacatur.

84.     The case was tried for a second time and Mr. Harris was found guilty of murder in the second degree.  A motion to set aside the verdict was submitted and denied and Mr. Harris was sentenced to a term of incarceration of twenty-five (25) years to life.

85.     He appealed the conviction and on July 28, 2011, the appellate court affirmed the jury's verdict.

86.     Plaintiff sought leave to the Court of Appeals.  The court granted leave and on October 18, 2012, the conviction was reversed.

87.     At the time of this decision, Plaintiff had already served over 3 ½ years of his prison term (three weeks upon being indicted in 2005, six months in 2007 after the first conviction, and then from July/August of 2009 to October of 2012 after the second conviction).

88.      The case was tried for a third time.  This trial resulted in a mistrial on May 15, 2015 and the case was retried for a fourth time.

89.     At the conclusion of the fourth trial, on May 24, 2016, Calvin Harris was acquitted of the one count of murder in the second degree, ending the eleven year nightmare that destroyed his life.

## DAMAGES

90.     The defendants' unlawful, intentional, willful, purposeful, deliberately indifferent, reckless, bad-faith and/or malicious acts, misdeeds and omissions caused Mr. Harris to be falsely

arrested, maliciously prosecuted, unfairly tried, wrongfully convicted, and to endure over three and one-half years of wrongful imprisonment.

91.     As a direct and proximate result of the acts of the Defendants, the injuries and damages sustained by Mr. Harris from the deprivation of civil rights include: violation of his clearly established rights under the Fourth and Fourteenth Amendments to the United States Constitution; personal injuries; pain and suffering; severe mental anguish; emotional distress; extreme fear; economic damages including loss of income; infliction of physical illness and injury resulting from his confinement; inadequate medical care; humiliation, indignities, and embarrassment; degradation; egregious injury to reputation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.  As a direct result of his unjust convictions and imprisonment, many these disabilities will plague Mr. Harris for the rest of his life.

92.     All the alleged acts, misdeeds and omissions committed by the individual defendants described herein for which liability is claimed were done intentionally, willfully, purposefully, knowingly, unlawfully, maliciously, wantonly, recklessly, and/or with bad faith, and said proscribed conduct of the individual defendants meets all of the standards for imposition of punitive damages.

## CAUSES OF ACTION

93.     With respect to each cause of action, Plaintiff Calvin Harris incorporates by reference each paragraph of this complaint.

## FEDERAL CLAIMS

### <u>COUNT I:</u>
**42 U.S.C. § 1983 Malicious Prosecution**
**in Violation of the Fourth and Fourteenth Amendments**

94.     Defendants acting deliberately and with malice, initiated and took steps to procure false testimony and continue the criminal prosecution of Mr. Harris, without probable cause or other legal justification, by fabricating evidence and false testimony, by physically altering the blood and then concealing their alteration from the defense, by physically altering the crime scene before taking pictures and then misrepresenting to the jury that the photographs were accurate depictions of the untouched scene, by falsely and knowingly representing as "scientific" testimony to the grand jury and petit juries that the droplets were "Michele's blood," when, in fact, the science simply did not permit such conclusion, by concealing the information in the matrimonial file that unequivocally established an explanation for the blood, by falsely claiming that Cal was disposing of Michele's belongings and marital keepsakes, by eliciting and presenting as true knowingly false testimony that Cal was disposing of Michele's belongings and marital keepsakes, by falsely claiming that Cal did not make the call to Michele on the morning of her disappearance, by eliciting and presenting as true knowingly false testimony that Cal did not make the call to Michele on the morning of her disappearance, by eliciting and presenting as true knowingly false testimony that Cal threatened to kill Michele, by refusing to investigate the only independent witness leads, and by acting in complete and utter reckless disregard of favorable evidence disproving Mr. Harris's guilt and incriminating Stacy Stewart and Chris Thomason.

95.     There was not even arguable probable cause to arrest or prosecute Mr. Harris on the basis of the witness statements, and no reasonable officer would have believed there was.

96.     The prosecution ultimately terminated in Mr. Harris's favor, when he was acquitted after a bench trial.

97.     The actions of the Defendants resulted in the unlawful prolonged detention of Mr. Harris and constituted a conscience-shocking failure to investigate the disappearance of Michele Harris.

98.     The actions of the Defendants violated Mr. Harris's clearly established rights under the Fourth and Fourteenth Amendments, and caused his wrongful conviction, three and one-half years of imprisonment and all the ongoing injuries and damages set forth above.

### COUNT II:
### 42 U.S.C. § 1983 Fabrication of Evidence
### in Violation of the Fourth and Fourteenth Amendments

99.     Defendants deliberately fabricated evidence and false testimony.

100.    Defendant Thayer was a willful participant, acting jointly with the other Defendants, she changed her testimony, lied, and procured false evidence.

101.    Defendants indoctrinated Defendant Thayer as their informant, convinced her to lie and change her statements, and fed her ideas and details of the criminal investigation as they understood them.

102.    Defendants physically altered the blood and then concealed their alteration from the defense, by physically altering the crime scene before taking pictures and then misrepresenting to the jury that the photographs were accurate depictions of the untouched scene.

103.    Defendants falsely and knowingly representing as "scientific" testimony to the grand jury and petit juries that the droplets were "Michele's blood," when, in fact, the science simply did not permit such conclusion.

104.    Defendants had Thayer and the other witnesses misrepresent the actual facts and

17

truth in both handwritten statements and reports as well as in oral, pretrial communications that were consistent with their later perjurious testimony.

105.    In so doing they grossly overstated both the incriminating value and the reliability of the statements that purported to implicate Mr. Harris.

106.    This fabrication of evidence violated Mr. Harris's clearly established Fourteenth Amendment rights to a fair trial and not to be deprived of liberty without due process of law.

107.    As a direct and proximate result of individual Defendants' fabrications, Mr. Harris was wrongfully convicted and suffered the injuries and damages described above.

**COUNT III**
**42 U.S.C. § 1983 Failure to Investigate**
**in Violation of the Fourth and Fourteenth Amendments**

108.    Notwithstanding the fact that no physical or forensic evidence connected Mr. Harris to Michele Harris's disappearance and the forensic investigation later proved all the incriminating details attributed to Mr. Harris to be false, coupled with the discovery of witness testimony of Michele Harris and her boyfriend being seen at the foot of her driveway, Defendants refused to acknowledge Mr. Harris's innocence or to investigate evidence demonstrating that Stacey Stewart had the motive, the means, and the opportunity to orchestrate Michele's death.

109.    This conscience-shocking failure to investigate obvious and known exculpatory leads deprived Mr. Harris of his liberty, in violation of the Fourth and Fourteenth Amendments.

**COUNT IV:**
**42 U.S.C. § 1983 Suppression of Favorable Evidence**
**in Violation of the Fourteenth Amendment**

110.    Defendants knowingly and deliberately chose not to document or disclose information that was favorable and material to Mr. Harris's defense, including, without limitation, the fact that Michele Harris had cut herself and bled in the garage months before her

disappearance, evidence of Michele's drug use, evidence of Michele's multiple boyfriends, evidence that Michele Harris and Stacey Stewart were seen by a witness at the foot of her driveway on the morning of her disappearance, evidence that Barbara Thayer did not make a call from the Harris home on the morning of Michele's disappearance, evidence that Cal Harris did not attempt to sell off Michele's belongings or sentimental keepsakes from the marriage, evidence that the blood was physically altered and then concealing the alteration, evidence that the crime scene was altered before taking pictures and then misrepresenting to the jury that the photographs were accurate depictions of the untouched scene, falsely leading the jury to conclude that Michele's hairdresser heard Cal Harris threaten Michele with death, and keeping from the jury the fact that this witness never made this statement when he spoke with  Trooper DelGiorno.

111.   The true facts, statements and information was material evidence that was favorable to Mr. Harris's defense, as it both vitiated the incriminating value of the so-called blood evidence and witness falsehoods and impeached the witnesses' perjurious version of events.

112.   In withholding material exculpatory and impeachment information, Defendants deprived Mr. Harris's defense team of it in violation of his clearly established Fourteenth Amendment right to a fair trial.

113.   Defendants' suppressions caused Mr. Harris's wrongful convictions, as well as all the ongoing injuries and damages set forth above.

## COUNT V:
### 42 U.S.C. § 1983 Civil Rights Conspiracy

114.   Defendants, acting within the scope of their employment and under color of law and/or as an agent of state actors, shared a common unlawful goal and agreed to act in concert to

deprive Mr. Harris of his clearly established constitutional rights, including the right to be free from malicious prosecution, the right not to be deprived of liberty without due process of law, and the right to a fair trial.

115.    Overt acts in furtherance of this conspiracy to violate Mr. Harris's civil rights include all those acts described above, the course of trickery and lies, and the fabrication of false evidence and testimony, including and not limited to having Thayer lie, and Thayer willfully participating and changing her statement documented in her journal that *she* began disposing of Michele's belongings as opposed to Cal being the one to dispose of these items; Thayer having a tag sale in order to publicly display the wrong impression that Cal was disposing of the family items; Thayer having a tag sale because Defendants told her to and allowing Defendant Mulvey the opportunity to gain possession of the commemorative wedding plate for evidence against Cal; having Thayer lie to Cal Harris to gain access to his home and belongings, and using her to surreptitiously lead the Defendants through the Harris home, identifying items to be seized for DNA testing and possible evidence; and, having Thayer lie by stating that she called Michele from the family home on the morning of her disappearance when Thayer had previously and unequivocally stated to law enforcement that she never made a phone call from the family home that morning.

116.    The overt acts the Defendants took in furtherance of the conspiracy continued through the trials and after Mr. Harris's conviction into post-conviction proceedings, with the suppression of exonerating and impeaching evidence as well as the procurement of defense witnesses.

117.    All the aforementioned acts were done intentionally in a concerted joint effort to ensure Mr. Harris's continued unconstitutional imprisonment and to cover up the Defendants'

unconstitutional and unlawful conduct.

118.    As a direct and proximate result of this conspiracy to violate his constitutional rights, Mr. Harris was wrongly arrested, indicted, prosecuted and imprisoned, and suffered all the ongoing injuries and damages set forth above.

**COUNT VI:**
**42 U.S.C. § 1983 Supervisory Liability**

119.    Supervisory Defendants, acting deliberately, recklessly and under color of law, were, at the relevant times, supervisory personnel with oversight responsibility for training, hiring, screening, instruction, supervision and discipline of Defendant Investigators and/or prosecutors and/or John Doe Defendants who deprived Mr. Harris of his clearly established constitutional rights.

120.    Defendant supervisors were personally involved in both the deprivation of Mr. Harris's constitutional rights and in creating or condoning the policy or custom of failing to take preventative and remedial measures to guard against such constitutional deprivations.

121.    Defendant supervisors were reckless in their failure to supervise Defendants, and either knew or should have known that Defendants were falsely arresting and maliciously prosecuting civilians, failing to investigate evidence pointing to other leads or suspects, fabricating and coercing witness testimony, suppressing exculpatory evidence, and depriving civilians of due process of law.

122.    These supervisory Defendants knew or in the exercise of due diligence would have known that the conduct of the named and John Doe Defendants against Mr. Harris was likely to occur.

123.    The failure of these supervisory Defendants to train, supervise and discipline the named individual Defendants and John Does amounted to gross negligence, deliberate

indifference or intentional misconduct which directly caused the injuries and damages set forth above.

**COUNT VII:**
**42 U.S.C. § 1983 *Monell* Claim for Unconstitutional Custom or Policy**
**and Failure to Supervise and Train**

124.    The County of Tioga and/or State of New York, by and through its final policymakers, had in force and effect during the Harris investigation and for years beforehand, a policy, practice or custom of conducting constitutionally inadequate investigations; of permitting investigations and/or prosecutions based upon the fabrication of inculpatory evidence; of failing to obtain probable cause to ensure that suspects would not be falsely arrested and/or maliciously prosecuted; of suppressing material information favorable to criminal defendants; and of failing to follow the duties imposed by *Brady v. Maryland.*

125.    The County of Tioga and/or State of New York systemically failed to adequately train its police officers, detectives, investigators, and prosecutors to conduct constitutionally adequate investigations; to not violate the law; to not fabricate evidence; to not withhold exculpatory evidence; and to obtain probable cause to ensure that suspects would not be falsely arrested and/or maliciously prosecuted.

126.    The County of Tioga and/or State of New York, by and through its final policymakers, failed to adequately discipline their investigators and prosecutors for investigative and/or prosecution wrongdoing, though it was foreseeable that constitutional violations of the type Mr. Harris suffered would be a predictable result of such failures.

127.    As set forth above, final policymakers for the County of Tioga and/or State of New York had actual or constructive notice of such failures to train, supervise and provide policy to its employees, and failed to provide training or supervision despite an obvious need that such

training and supervision was required, where Defendants knew that it was foreseeable that investigators and prosecutors would predictably confront these situations and as a result of the failure to train and supervise, constitutional violations would result.

128.    Such failures to train, supervise and discipline, and such unconstitutional municipal customs, practices and/or policies, amounted to deliberate indifference to the constitutional rights of criminal defendants like Mr. Harris, were the moving force behind the witnesses' false and fabricated testimony and the fabricated evidence, and caused his arrest, prosecution, and incarceration, as well as all the ongoing injuries and damages set forth above.

<u>**COUNT VIII:**</u>
**42 U.S.C. § 1983 Due Process and Stigma-Plus Defamation**

129.    Defendants published Plaintiff's name and made false claims, referring to him as the murderer of Michele Harris.

130.    These statements are false.

131.    As a result of these statements, Plaintiff has suffered public humiliation, damage to his reputation, loss of employment, loss of personal associations and loss of the benefits of liberty.

132.    The publishing of Plaintiff's name and reference to him as a murderer was maintained and/or disseminated in a fashion that resulted in the above stated losses.

## STATE-LAW CLAIMS

### COUNT IX:
### Malicious Prosecution

133.    The individually named Defendants and/or John Doe Defendants, lacking probable cause, nonetheless intentionally, recklessly, and with malice, caused Mr. Harris to be arrested, prosecuted, and convicted of murdering his ex-wife.

134.    Defendants were complaining witnesses whose actions initiated or commenced the prosecution, and who took steps to ensure that it continued.

135.    Furthermore, the Defendants intentionally withheld and misrepresented facts vitiating probable cause against Mr. Harris, including but not limited to, by physically altering the blood and then concealing their alteration from the defense, by physically altering the crime scene before taking pictures and then misrepresenting to the jury that the photographs were accurate depictions of the untouched scene, by falsely and knowingly representing as "scientific" testimony to the grand jury and petit juries that the droplets were "Michele's blood," when, in fact, the science simply did not permit such conclusion, by refusing to investigate the only independent witness leads, by recklessly disregarding favorable evidence disproving Mr. Harris's guilt and incriminating Stacy Stewart and Chris Thomason, by not disclosing that Michele Harris had cut herself and bled in the garage months before her disappearance, by not disclosing evidence of Michele's alleged drug use, evidence of her multiple boyfriends, evidence that Michele Harris and Stacey Stewart were seen by a witness at the foot of her driveway on the morning of her disappearance, evidence that Barbara Thayer did not make a call from the Harris home on the morning of Michele's disappearance, evidence that Cal Harris did not attempt to sell off Michele's belongings or sentimental keepsakes from the marriage, by falsely leading the jury to conclude that Michele's hairdresser heard Cal Harris threaten Michele with death, and by

keeping from the jury the fact that this witness never made this statement when he spoke with Trooper DelGiorno.

136.    As Mr. Harris has maintained for over seventeen years, he is innocent of his ex-wife's disappearance.

137.    The prosecution finally terminated in Mr. Harris's favor when he was acquitted after the fourth trial.

138.    As a direct and proximate result of defendants' actions, Mr. Harris was wrongly prosecuted for eleven years, convicted and imprisoned for over three and one half years, and suffered other grievous and continuing damages and injuries set forth above.

## COUNT X:
### Intentional or Negligent Infliction of Emotional Distress

139.    The deliberate conduct of Defendants in fabricating false testimony and evidence, their ensuing refusal to investigate the obvious suspect, and their cover-up of the truth, perpetuated in public statements, constitutes the intentional infliction of emotional distress.

140.    In the alternative, the conduct of Defendants breached a duty of care owed to Mr. Harris as a crime victim and as a citizen, which unreasonably endangered his physical safety, his children's safety, or caused him to fear for his own safety and his children's safety, constituting the negligent infliction of emotional distress.

141.    Defendants' conduct, falsely implicating Mr. Harris in the murder of Michele Harris and subjecting him to public stigma to this day notwithstanding the dismissal of charges against him, caused Mr. Harris to suffer ongoing, unimaginable emotional distress and traumatic psychological sequellae.

**WHEREFORE**, Calvin Harris prays as follows:

A.  That the Court award compensatory damages to him and against the defendants, jointly and severally, in an amount to be determined at trial;

B.  That the Court award punitive damages to him, and against all individual defendants, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

C.  For a trial by jury;

D.  For pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E.  For any and all other relief to which he may be entitled.

Dated: Garden City, New York
   August 22, 2017

         BARKET MARION EPSTEIN & KEARON

     By:     /s/ bab
         Bruce Barket, Esq. – Bar Roll #: 510384
         666 Old County Road-Suite 700
         Garden City, N.Y.  11530
         (516) 745-1500