UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CALVIN HARRIS,

                Plaintiff,

         -v-                   3:17-CV-932

TIOGA COUNTY, FORMER TIOGA
COUNTY DISTRICT ATTORNEY
GERALD KEENE, NEW YORK
STATE POLICE INVESTIGATOR
STEVEN ANDERSEN, NEW YORK
STATE POLICE INVESTIGATOR
SUSAN MULVEY, and BARBARA
THAYER,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:               OF COUNSEL:

BARKET EPSTEIN & KEARON     ALEXANDER R. KLEIN, ESQ.
  ALDEA & LOTURCO, LLP       BRUCE A. BARKET, ESQ.
Attorneys for Plaintiff Calvin Harris  DONNA ALDEA, ESQ.
666 Old Country Road, Suite 700
Garden City, NY 11530

GOLDBERG, SEGALLA LAW FIRM   MOLLY M. RYAN, ESQ.
Attorneys for Defendants Tioga
  County and Gerald Keene
5786 Widewaters Parkway
Syracuse, NY 13214

HON. LETITIA JAMES
New York State Attorney General
Attorneys for Defendants Steven
   Andersen and Susan Mulvey
The Capitol
Albany, NY 12224

ADRIENNE J. KERWIN, ESQ.
COLLEEN D. GALLIGAN, ESQ.
LAUREN ROSE EVERSLEY, ESQ.
Ass't Attorneys General

BUTLER, BUTLER LAW FIRM
Attorneys for Defendant
   Barbara Thayer
231-241 Main Street
Vestal, NY 13850

MATTHEW C. BUTLER, ESQ.
DAVID E. BUTLER, ESQ.

DAVID N. HURD
United States District Judge

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ................................................................... 4

II.  BACKGROUND ................................................................... 8

III. LEGAL STANDARD ........................................................... 27

IV.  DISCUSSION .................................................................... 28

    A. Preliminary Issues ........................................................ 28

        1. Abandoned Claims.................................................. 29

        2. Investigator Lester ................................................. 30

        3. The Does ................................................................ 31

        4. The DA's Office ..................................................... 31

    B. Remaining Claims......................................................... 32

        1. Malicious Prosecution (Counts One and Nine) ...... 33

           i. Timeliness ........................................................ 33

          ii. The Merits........................................................ 41

             a. State Defendants ...................................... 42

             b. County Defendants .................................. 45

        2. Fabrication of Evidence (Count Two) ..................... 51

           i.  State Defendants ............................................... 52

          ii. County Defendants ........................................... 54

          iii. Ms. Thayer ...................................................... 55

        3. Conspiracy (Count Five)........................................ 57

        4. Municipal Liability (Count Seven).......................... 58

    C. Qualified Immunity....................................................... 60

V.  CONCLUSION .................................................................. 62

# DECISION and ORDER

## I. INTRODUCTION

On September 12, 2001, just after 7 o'clock in the morning, Barb Thayer, the family's babysitter, made a short drive over to the Harris's house to help get the kids off to school.  When she arrived at the foot of the property's long driveway, Ms. Thayer discovered Michele Harris's van abandoned near the gated entrance.  The keys were in the ignition.  But Michele was nowhere to be found.  And she has not been seen since.

Michele's mysterious disappearance was reported to law enforcement later that day.  Suspicion immediately fell on her husband, Calvin.  Although the couple still shared a home with their four children, they were in the middle of a contentious divorce.  And Calvin, a prominent local businessman, stood to lose a lot of money in the breakup.

With this working theory of a motive, State Police dug into the prospect of Calvin's involvement in Michele's disappearance.  Their initial search turned up scant physical evidence.  And four additional years of official scrutiny into Calvin's life produced little else.  Police eventually resorted to some deceptive tactics in the hopes that Calvin might incriminate himself.  But nothing ever broke the case open.  They never located a murder weapon.  Or even a body.

With their leads exhausted and the case gone cold, investigators pressured the local District Attorney to move forward anyway.  In the spring of 2005,

the DA presented what he had to a grand jury, which voted to indict Calvin for Michele's murder.  But it soon became clear that the investigators didn't have much to show for four years of work—the murder charge was thrown out by the trial court when it came to light that the indictment relied on the DA's "intentional" presentation of speculative, inadmissible opinion testimony about the state of the Harris's marriage and pending divorce.

Investigators ran back to the drawing board.  In February of 2007, the same District Attorney convinced a newly empaneled grand jury to return a second murder indictment.  This time around, though, the grand jury heard some different evidence.  According to Calvin, this change in the proof was the product of official misconduct: the prosecutor had conspired with the lead investigator and others to coerce key witnesses into changing their stories to better fit the murder narrative.  What's more, Calvin says, they conspired to fabricate or manipulate crucial physical evidence, too.

Misconduct or no, a trial jury finally heard the case and voted to convict Calvin for Michele's murder.  But right after the verdict, a local farmer came forward to say that he'd seen Michele and an unidentified man—a man who was definitely not Calvin—standing in the driveway of the Harris's property just after daybreak on the morning she disappeared.  The farmer's testimony, if believed, would have blown up the prosecution's timeline of the supposed murder and subsequent cleanup.  So Calvin was granted a new trial.

With the benefit of the farmer's testimony, a second jury heard the case and also voted to convict. Calvin began a lengthy prison sentence. On direct appeal, the Appellate Division reviewed the conviction and affirmed. Sure enough, though, the proof that seemed to support the verdict overlapped with the evidence that Calvin would later claim was fabricated.

Eventually, the Court of Appeals vacated the conviction on other grounds and ordered a new trial. By the time the case came back down to Tioga County for renewed proceedings, four more years had passed. A national media frenzy had come and gone. The lead investigator had retired. And the DA had leveraged his high-profile victory into a seat on the county bench.

Re-starting the case from scratch took just over a year of preparation. A third trial in a neighboring county with a new prosecutor ended with a hung jury. The case was re-tried to the bench a year later. That trial—the fourth, for those keeping score—ended in an acquittal on May 24, 2016.

Calvin claims he'd finally been able to show the fact-finder what his own private investigators had learned: that law enforcement had fabricated the evidence used to convict him. In fact, they were so busy doctoring the proof that they'd failed to take a good look at the two out-of-towners who'd been hanging around with Michele at the time of her disappearance.

On August 22, 2017, Calvin Harris filed this 42 U.S.C. § 1983 action alleging that defendants Tioga County (the "County"), the County District

Attorney's Office (the "DA's Office"), former County District Attorney Gerald Keene ("DA Keene") (collectively the "County defendants"), New York State Police Investigators Susan Mulvey ("Senior Investigator Mulvey"), Steven Andersen ("Investigator Anderson"), Mark Lester ("Investigator Lester") (collectively the "State defendants"), along with Barbara Thayer, the family's former babysitter ("Ms. Thayer"), conspired with each other to maliciously prosecute him on the basis of false and fabricated evidence.

The ten-count complaint asserts § 1983 claims for malicious prosecution (Count One), fabrication of evidence (Count Two), a failure to investigate (Count Three), the suppression of evidence (Count Four), conspiracy (Count Five), supervisory liability (Count Six), municipal liability (Count Seven), and defamation (Count Eight) as well as related state law claims for malicious prosecution (Count Nine) and infliction of emotional distress (Count Ten).

On October 5, 2017, the County defendants moved under Federal Rule of Civil Procedure ("Rule") 12(e) for a more definite statement of plaintiff's claims. Dkt. No. 14. That motion was denied on August 19, 2019. *Harris v. Tioga County*, 2019 WL 3890994 (N.D.N.Y.). Thereafter, the parties completed a relatively uneventful period of discovery. The exception was a dispute over whether non-party witness attorney Betty Keene should be compelled to answer certain deposition questions about communications she had with Michele during the divorce case. Dkt. No. 68. After briefing and

argument, U.S. Magistrate Judge Thérèse Wiley Dancks denied plaintiff's motion to compel.  Dkt. No. 77.  Plaintiff appealed but this Court affirmed on July 16, 2021.  *Harris v. Tioga County*, 2021 WL 3022052 (N.D.N.Y).

On June 2 and June 3, 2022, the County defendants, the State Police defendants, and Ms. Thayer each moved separately for summary judgment on plaintiff's various claims.  Dkt. Nos. 97, 100, 101.  Those three motions were fully briefed.  Dkt. Nos. 110, 115, 117, 118, 119.  Oral argument was heard on January 12, 2023 in Utica, New York.  Decision was reserved.

## II. __BACKGROUND__[1]

Calvin wed Michele on September 29, 1990.  The couple soon welcomed four children into their lives.  The family lived together at 381 Hagadorn Hill Road, a 200-acre estate in rural Spencer, New York.  The property featured a long, gently curving driveway that ran up to the residence itself, which sat in the woods near the edge of Empire Lake.

---

[1] Although plaintiff took some discovery in this action (*e.g.*, the deposition of non-party attorney Betty Keene, referenced in the Introduction), the State defendants correctly pointed out at oral argument that plaintiff's opposition to summary judgment relies heavily on pre-existing proof; *e.g.*, the evidence generated in the run up to the grand jury presentations.  The State defendants went on to suggest that this should weigh against the viability of plaintiff's § 1983 claims.  But not every civil rights case is going to be about completely divergent bodies of proof.  Sometimes a case is just about the permissible range of inferences that a fact-finder might rationally draw from the complete body of evidence.  Of course, on summary judgment the record must be viewed in the light most favorable to the non-movant.  So the version of events set forth in this section is the one that favors plaintiff.

On January 17, 2001, Michele filed for a divorce on the statutory grounds of "cruel and inhuman treatment."  Ex. A at 2.[2]  She hired a local attorney by the name of Robert Miller.  He hired Betty Keene, another local lawyer, to help him out.  Attorney Keene met with Michele, talked with her about the divorce proceedings, and helped prepare some filings in the case.

Attorney Keene is relevant to this story for two reasons.  First, she is the wife of DA Keene, who presented the murder case to the grand juries and prosecuted Calvin at the first two trials.  Second, attorney Keene took notes of her meetings with Michele.  Attorney Keene's notes describe an instance in which Michele recounted being pushed to the ground during an argument with Calvin.  Ex. F at 3.  Michele reported to attorney Keene that when this happened, she "cut her hand on the ice," which "caus[ed] it to bleed."  *Id*.

As the description of this event might suggest, the couple's separation and divorce proceedings were contentious.  The marriage had been in trouble for a while.  Both parties had been unfaithful.  Michele's decision to file for the divorce had sparked arguments, and there were accusations that some of these disputes had become physical.  Calvin had also reportedly cut Michele off from the family's bank accounts.

---

[2]  Pagination corresponds to CM/ECF rather than any particular document's internal pagination.  References to exhibits correspond to those attached to the Barket Decl., Dkt. No. 110-2, unless otherwise noted.

True or not, Michele had picked up a part-time job at Lefty's, a restaurant in nearby Waverly, New York.  She began staying out late and spending time with other men.  This included a man named Stacy Stewart.  A native of Texas, Mr. Stewart stood about five-foot-nine, with an athletic build.  He drove a black pickup truck and worked for a local fabrication company called Vulcraft.  There were reports that Stewart was known to be a lawbreaker: he and another man named Chris Thomason had burglarized a co-worker's home.  Mr. Stewart also owned a cabin in the woods of Lockwood, New York.

During the spring and into the summer of 2001, the Harris's divorce case slowly worked its way toward a conclusion.  Calvin and Michele continued to share the Hagadorn Hill Road house with their four kids.  Near the end of that summer, the divorce court set a trial date for October.  But that date was likely to be little more than a placeholder.  As attorney Miller later explained to law enforcement during the investigation, discovery was incomplete.  For one thing, the parties were waiting for the divorce court to rule on attorney Miller's request for an accounting of Calvin's businesses.  Ex. Q at 3.  For another, there was the budding possibility that Calvin and Michele might reach an amicable settlement.  *See, e.g.*, Ex. R at 108.  After all, Michele had just bought her own house and told others that she planned to move out.  *Id.*

On September 11, 2001, at about 2:30 in the afternoon, Ms. Thayer headed over to the house to watch the children.  Michele was getting ready to leave

for work at the restaurant.  Calvin was still at the office.  Ms. Thayer left

that evening around 6:30 p.m., shortly after Calvin got home.  Ex. S at 3.

Elsewhere, Michele's evening shift at the restaurant ended and she went out

drinking for a while with Mr. Stewart and Mr. Thomason.  Ex. P ¶ 9.

Early the next morning, at about 4:30 a.m., a local farmer named Kevin

Tubbs started his day before the sunrise.  Ex. T ¶ 6.  It was still dark outside

when Farmer Tubbs left his house and headed over to a neighboring farm to

finish loading up some hay.  *Id*. ¶¶ 6–7.  His route took him right past the

entrance to the Harris's property on Hagadorn Hill Road.  *Id*.

Farmer Tubbs "noticed nothing out of the ordinary" on his outbound trip

past the Harris's place that morning.  Ex. T ¶¶ 6–7.  He spent some time

loading up his wagon and hitching it to his truck.  *Id*.  He isn't sure precisely

how long that took.  *Id*.  But he recalls that his return trip was planned to

coincide with daybreak: he waited until it was "light enough out" that he

"could be seen by any other drivers that [he] might meet" on the road.  *Id*.

On his way back home with a wagonload of hay, Farmer Tubbs observed a

more interesting scene as he passed by the Harris's property.  Ex. T ¶ 9.  He

saw a "vehicle stopped or parked cockeyed, with the front of the vehicle in the

end of the driveway and the rear extending into the roadway and partially

blocking the roadway."  *Id*.  He recalls that it was a "Chevrolet pick-up truck,

either a dark blue or black in color."  *Id*.  In fact, Farmer Tubbs says, he

slowed down because he wasn't sure his wagon would be able to make it safely around the truck. *Id*.

As he maneuvered carefully around the truck, Farmer Tubbs:

> looked over and observed two individuals outside of the truck, both standing on the passenger side. One was a blonde woman who looked like the woman whom [he] had previously seen at the Harris property. She was leaning on the box of the pick-up truck; she appeared to be crying, and did not look up at [him] while [he] was looking at her. The other individual, who stared directly at [him] as [he] passed, was a young white (but tanned) male, who [he] would estimate to be early to mid-20's, with a muscular build and brown hair.

Ex. T ¶ 10. He did not recognize the man. *Id*. But he was sure it was not Calvin. *Id*. And while he didn't get a very good look, Farmer Tubbs reported he also saw a second vehicle—an SUV or maybe a van—parked in the Harris family's driveway just ahead of the dark pickup truck. *Id*. ¶ 11.

What happened over the next few hours is unknown.[3] However, at around 7 o'clock that morning, Ms. Thayer prepared to head back over to the Harris's house to help get the children ready for school. Before she left her own place,

---

[3] A careful reader might recall that Stacy Stewart owned a black pickup truck. And at some point later that day, Chris Thomason showed up at Stewart's cabin "covered in blood" and burned all of his clothing in a fire pit. Ex. U ¶¶ 12, 15. In 2012 and again in 2013, Thomason would tell others that Stewart was involved in Michele's disappearance. *Id*. ¶ 11; Ex. P ¶¶ 5–8. Thomason's version of events seemed to exculpate him. But those who heard his story came to believe that Thomason was somehow involved, too. Many years later, a forensic archeologist hired by Calvin to examine the burn pit at Stewart's cabin recovered "a clothing strap, a knife blade, a key, and a piece of metal that may possibly represent a belt buckle." Ex. W at 8.

Ms. Thayer called a friend to say she wasn't going to be able to meet up with him later that day.  Her friend didn't pick up his phone, so Ms. Thayer left a message on his answering machine.  The whole telephone call took just over a minute or so.  Ms. Thayer then got in her car and headed to the Harris's house, which was an additional four- or five-minute drive away.

When Ms. Thayer arrived at the foot of the Harris's long driveway, she saw something out of the ordinary: Michele's van was parked near the gated entrance.  Ms. Thayer got out to investigate.  Ex. Z at 4.  She peeked in the driver's side window, where she saw that the keys were still in the van's ignition.  *Id.*  She also saw a pack of cigarettes and a makeup container, but noticed that Michele's purse was missing.  Ex. AA at 3.  Ms. Thayer opened the back of the van to see if perhaps Michele had a rough night and was just sleeping it off inside.  *Id.*  But Michele was not there.  *Id.*  So Ms. Thayer closed the van back up, returned to her car, and headed up the driveway.

By now it was 7:14 a.m.  Calvin wanted to leave for work.  But neither Michele nor Ms. Thayer had shown up to help him with the kids.  Calvin had already talked to Ms. Thayer, so he knew she was on her way over.  But he also expected Michele to be home by now.  So Calvin placed a call from the house phone to Michele's cell phone.  Ex. AB at 3; Ex. AC at 3.  Michele did not pick up.  *Id.*  And Calvin hung up without leaving a message.  *See id.*

- 13 -

Around that time, Ms. Thayer arrived at the house. She parked her car, walked in through the garage, and yelled for Calvin. He met her in the kitchen, where she:

> asked him if Michele was there and he said no. [She] told him that her van was at the end of the driveway. He said that [they'd] better go get it. Cal and [Ms. Thayer] got in his truck and drove to the end of the driveway. While [they] drove down to the van, [she] said to Cal that maybe Michele had been drinking and got out of the van and started walking in the wrong direction. Cal said that Michele had been partying a lot.

Ex. S at 4. Ms. Thayer drove the van back up to the house. *Id.*

At about 8:00 a.m., Calvin left the house with the three eldest children in tow. He dropped them off at school on his way into work. Around 8:20 a.m., Ms. Thayer fielded a telephone call from Nikki Burdick, one of Michele's close friends. Ms. Thayer told Burdick that Michele hadn't come home last night and that they'd found her van abandoned near the driveway. Hearing this news, Ms. Burdick concluded that "something was wrong" and said that she planned to call the police and make a report. Ex. S at 4–5.

Ms. Burdick also called attorney Miller, Michele's attorney, and filled him in with the news about Michele's disappearance. Ex. Q at 3. Attorney Miller contacted the State Police. *Id.* Senior Investigator Mulvey fielded attorney

Miller's telephone call that day.[4]  Ex. K at 16–17.  So Senior Investigator Mulvey wound up leading the investigation.  *Id*.  Attorney Miller handed over Michele's entire client file, including the records of Michele's communications with attorney Keene, to the investigators.  *See* Ex. AN.

The State Police began an extensive investigation that seemed to focus almost exclusively on Calvin.  They interviewed Calvin's friends, relatives, and colleagues.  Ex. K at 33.  They searched the home, the woods around the 200-acre property, and the land adjacent to those holdings.  *Id*. at 61.  They searched the lake.  *Id*. at 62.  They searched his computers, his truck, the driveway, the property's boat dock, and even some underground pipelines they found running near the house.  *Id*.  They went through his trash.  *Id*. at 63.  They attached a GPS tracking unit to his car.  *Id*. at 67–68.

When those efforts failed, investigators got creative.  They flew helicopters over Calvin's house, the adjacent lake, and the rest of the large property at a height that barely cleared the tree line.  Ex. K at 78–80.  They set up cameras outside his home just "[t]o see what he did."  *Id*. at 70.  They surprised him at the airport when he returned home from a trip with his children "to see what he would do or who he would call."  *Id*. at 72.  They even lied to him about the status of the investigation just to see "how he reacted."  *Id*. at 69.

---

[4]  Senior Investigator Mulvey's father was a former employee of the Harris family's car dealership business.  Ex. K at 25.  He had previously been fired by Calvin.  *Id*.

Despite their doggedness and creativity, the only physical evidence the State Police recovered was some red staining in the house on a rug, a kitchen wall, and the garage floor.  *See* Ex. BE at 7.  And even this discovery came up a bit short.  Forensic tests of this "red staining" with "fluorescein," a sensitive compound used to detect the presence of blood or its removal, actually came back negative from areas in the garage.  Ex. AV at 5.

In total, this discovery amounted to no more than an eighth of a teaspoon of blood, which equaled about ten drops.  Ex. BE at 7.  Thinking that maybe the rest of the blood had been cleaned up or washed down a drain, the State Police used sensitive chemical tests throughout the surfaces in the house and in the plumbing.  Ex. I at 21–22.  But they did not find any more traces of blood.  *Id*.  According to plaintiff, the small amount of blood that all these forensic tests actually managed to detect is easily explained by Michele's story to attorney Keene about having cut her hand after a fall on the ice.

The State Police had always kept the DA in the loop.  Ex. K at 101–02.  But DA Keene also played an active role in the investigation.  He traveled with Senior Investigator Mulvey to Albany to help her present the case to a State Police Forensic Unit.  *Id*. at 102.  He traveled with State Police to help present the case to the Federal Bureau of Investigation.  *Id*.  He traveled with Senior Investigator Mulvey to Boston, where they interviewed Calvin's

ex-wife. Ex. R at 201. And he invited the State Police to participate with him on some witness interviews he set up himself, too. *Id.* at 204.

By the spring of 2005, the case had gone cold. Senior Investigator Mulvey began pushing DA Keene to present the case to a grand jury anyway. Ex. R at 205–06. When DA Keene asked investigators to "be patient with [him]," State Police leadership suggested that maybe their own prosecutors should take the case off DA Keene's hands. *Id.* at 206–08.

In September of 2005, DA Keene presented the case to a grand jury, which indicted Calvin for second-degree murder. *People v. Harris*, 838 N.Y.S.2d 345 (Co. Ct. 2007). Calvin moved to dismiss the indictment as legally insufficient or otherwise defective. *Id.* After that motion was denied, DA Keene turned over to the defense the grand jury minutes. *Id.* Calvin renewed his motion to dismiss the indictment based on what he discovered in that transcript. *Id.*

On Friday, December 15, 2006, the presiding judge, "apparently as a courtesy to counsel," called the prosecutor and defense counsel into chambers and advised them that he planned to grant Calvin's motion to dismiss the indictment. *Harris*, 838 N.Y.S.2d at 347. But before the judge could file a written decision dismissing the indictment, and in "an apparent effort to avoid that decision by the court," DA Keene moved on an emergency basis for an order of recusal. *Id.* The presiding judge called the request "baseless," but decided to recuse himself because the "sworn allegations" in DA Keene's

application for recusal had "pitt[ed] his oath of office against that of the court." *Id*. After the case was reassigned, Calvin renewed his motion to dismiss the indictment based on the grand jury minutes. *Id*. at 348.

On January 28, 2007, the newly assigned judge dismissed the indictment against Calvin. *Harris*, 838 N.Y.S.2d at 350. In doing so, the court concluded that DA Keene had "intentionally" presented an "overwhelming" amount of "improper" hearsay evidence that had prejudiced the grand jury proceedings:

> Twenty-seven witnesses testified before this Grand Jury. Most of those witnesses were permitted, improperly, to offer their opinions as to the state of defendant's marriage, Michele Harris' intent with regard to the divorce. They gave personal opinions concerning the defendant, his wife, his wife's boyfriend, the defendant's net worth, what type of employer the defendant was/is, his character, whether he had or did not have a propensity to commit the alleged crime, whether he was/is a "good" father or a good husband, and in contrast, whether Michele Harris was a good mother, or a good wife. One witness gave what amounted to his opinion as to whether the defendant committed the crime charged.
>
> . . . .
>
> Ms. Harris' attorney (in the divorce proceeding) was permitted to testify as to statements made to him by her which did not fall into any exception to the hearsay rule. He was allowed to testify about the state of his client's marriage to the defendant, the status of the divorce action then pending. In this regard he offered his inadmissible opinion about several matters relating to that litigation. He was also permitted to testify concerning the content of the divorce file

> including allegations being made by Michele Harris in
> that action, none of which is admissible evidence.
>
> That there was an action for divorce pending, filed by
> Michele Harris, was admissible as it goes to the issue
> of a possible motive on the part of the defendant to
> commit the alleged crime.  Not permissible, however,
> was opinion testimony and speculation by Ms. Harris'
> attorney regarding the divorce action and proceedings
> therein, particularly whether or not the defendant and
> his attorney were being forthright in their efforts to
> settle the divorce action.  His testimony, amounting to
> nothing more than his opinion, as to how divorce
> actions generally proceed, was clearly inadmissible.

*Id*. at 351–52.  The trial court went on to fault DA Keene for his "patently

improper" comments to the grand jury.  *Id*. at 353.  Ultimately, the trial court

dismissed the indictment "with leave to the District Attorney to apply for an

order permitting resubmission of the charge to another Grand Jury."  *Id*.

With their first indictment thrown out, the State Police and the District

Attorney were forced back to the drawing board.  According to Calvin, they

worked to gin up some evidence that would better fit a murder narrative:

The Status of the Divorce.  In early interviews, attorney Miller told State

Police that the October 2001 trial date in the divorce case was probably just a

placeholder, since the parties were still waiting for the court to rule on their

request for an audit of Calvin's businesses.  Ex. Q at 3.  Even so, defendants

elicited testimony from witnesses that emphasized the looming trial date as Calvin's likely motive for the murder.[5]  *See, e.g.*, Ex. D at 7.

A Threatening Phone Call.  On September 25, 2001, the State Police interviewed a man named Jerome Wilczynski, Michele's hair stylist at a local salon.  Ex. AS at 3.  In this first interview, Mr. Wilczynski reported that he had overheard a telephone call between Michele and Calvin in which Calvin told her to "drop the divorce proceedings and come back to the Harris family fortune" or else "he would make it very difficult on her."  *Id*.  Mr. Wilczynski told substantially the same version of events during a second interview with State Police a short time later.  Ex. K at 141.

Notably absent from Mr. Wilczynski's original descriptions of this phone call is any mention of an overt threat from Calvin.  Later, however, after a conversation with Senior Investigator Mulvey, Mr. Wilczynski's testimony changed in a big way.  Ex. K at 142.  Now, Mr. Wilczynski claimed, Calvin had told Michele "that he could make her disappear, and she was to stop all of this divorce nonsense."  Ex. C at 73.  Mr. Wilczynski would later testify to that much more damaging version of events.

Ms. Thayer's Contributions.  In her interviews and conversations with the State Police in the days and weeks shortly after Michele's disappearance, Ms.

---

[5]  Attorney Miller died before the second indictment.  So defendants elicited this testimony from his paralegal.  Ex. C to Barket Decl., Dkt. No. 110-5 at 5.

Thayer never claimed that she made the 7:15 a.m. phone call to Michele's cell phone from the Harris family's house phone. Ex. S; Ex. AD at 6–7. To do so would have been almost impossible. After all, Ms. Thayer definitely made a call from her own house at 7:08 a.m., waited on the line to leave a voicemail, then left her house, made the four- or five-minute drive over to the Harris's property, and took a little time to inspect Michele's van before traveling up the driveway, through the garage, and into the house. *See, e.g.*, Ex. I at 30.

For some reason, though, Ms. Thayer later took credit for this telephone call during her testimony to the grand jury. Ex. C at 13; Ex. D at 16, 107. As plaintiff points out, the change in Ms. Thayer's story came after she began regularly communicating with Senior Investigator Mulvey. Ex. AP. One plausible explanation for Ms. Thayer's change in tune would be to minimize the exculpatory value a jury might attach to this call if they learned Calvin had made it. As DA Keene later acknowledged, if Calvin was trying to create a "fake alibi" with this call, you would have expected him to leave a voicemail evincing false concern for Michele's whereabouts. Ex. R at 133.

Ms. Thayer also changed her story about the fate of Michele's clothing and personal effects. Investigators obtained a copy of Ms. Thayer's diary early on in their investigation. There, Ms. Thayer wrote down that she had bagged up Michele's clothes and put them in the laundry room shortly after Michele's disappearance. Ex. AQ at 18. However, in her later testimony, Ms. Thayer

accused Calvin of boxing up Michele's things right away.  Ex. C at 17; Ex. D at 20.  How could Calvin know Michele wasn't coming back?

Blood Evidence.  Without a weapon or a body, the blood evidence was the centerpiece of any case against Calvin.  But investigators knew right from the start that there was a perfectly plausible explanation for the miniscule blood staining found around the entryway to the house—Michele's cut to her hand, which was recorded in the notes from attorney Keene that had been turned over by attorney Miller as part of the divorce file.

Even so, the State Police went ahead with a scheme to make the blood evidence more compelling.  They "corrected the exposure" on photographs of the blood to lighten its color.  *See, e.g.*, Ex. K at 215.  Senior Investigator Mulvey claimed this was done simply to "try and see more detail."  *Id*. at 216.  But Investigator Andersen would later testify that the lighter coloration of the blood in the photographs meant that it was "fresher in nature."  Ex. C at 49; Ex. D at 44.  The prosecution elicited this testimony from Investigator Andersen despite being aware that the idea of "aging blood"—especially from intentionally altered photographs—was "junk science."  Ex. I at 43.

Investigator Andersen also testified that the pattern of the blood staining captured in the various photographs indicated that it was generated by a blunt force trauma.  Ex. C at 42–43; Ex. D at 38.  But just like the idea of

aging blood by looking at altered photographs, Investigator Andersen knew this kind of forensic science was "obsolete."  Ex. AV at 3–4; Ex. I at 19.

Worse still, the photographs of the blood were not taken until after the blood itself had already been manipulated.  In violation of forensic protocol, Investigator Andersen swabbed the stain with distilled water for analysis *before* photographing it.  Ex. AY at 6–23; Ex. AW at 8.  But protocol called for exactly the opposite—photographs of the unadulterated blood were supposed to be taken first, followed by the swab for later analysis.  *Id*.

Other Explanations.  Finally, defendants elicited testimony tending to show that Michele had never cut her hand around the Hagadorn Hill Road house despite knowing about the incident recorded in the divorce file.  Ex. C at 10 (Barbara Thayer); 22 (Brian Earley); 30 (Nicole Burdick); Ex. D at 12 (Barbara Thayer); 48 (Nicole Burdick); 116–17 (Taylor Harris).

In February of 2007, a second grand jury returned a second indictment after hearing this evidence.  Beginning in late May of 2007, the murder case went to a trial.  The jury heard roughly this same body of evidence and voted to convict Calvin for murder.  But within hours of the verdict, Kevin Tubbs, the local farmer, contacted Calvin's attorney to share his story.

This new witness threw a wrench in the prosecution's timeline of the supposed murder and cleanup.  As the Appellate Division later explained:

> It was the People's theory at trial that defendant had at least eight hours to kill the victim, clean up the crime scene and dispose of her body before he called the babysitter, who arrived a little after 7:00 a.m. Tubbs's testimony, had it been presented at trial and credited by the jury, would have served to undermine the People's theory inasmuch as it would have established that a woman matching the victim's description was observed in the company of an unidentified male several hours after the time that the People argued that defendant had killed her, leaving defendant less than two hours to commit the crime and dispose of the body.

*People v. Harris*, 865 N.Y.S.2d 386, 387 (3d Dep't 2008).

Calvin moved to set aside the verdict on the basis of this newly discovered evidence; *i.e.*, Farmer Tubbs's account of what he saw as he passed by the Harris's property that morning. The trial court conducted a hearing, took some evidence, and then granted Calvin's request. The prosecution appealed, claiming that Farmer Tubbs's testimony was "patently incredible." But the Appellate Division rejected that argument. *Harris*, 865 N.Y.S.2d at 388.

In July of 2009, a second jury heard substantially the same case, but this time with the benefit of Farmer Tubbs's testimony. Ultimately, the second jury also voted to convict. Calvin was sentenced to twenty-five years to life in prison. On direct appeal, a three-to-one majority of the Appellate Division affirmed. *People v. Harris*, 928 N.Y.S.2d 114 (3d Dep't 2011). In rejecting a challenge to the sufficiency of the evidence, the majority's opinion walked

through a discussion of the prosecution's best evidence, which overlapped

heavily with the allegedly manipulated or fabricated proof discussed *supra*.

For instance, the Appellate Division concluded that the prosecutor had

identified a likely motive: Calvin's desire to avoid "the expensive, impending

appraisal of his business and the trial scheduled for October 2001." *Harris*,

928 N.Y.S.2d at 120. But according to Calvin, everyone knew the trial date

was just a placeholder and that the parties were on the road to a settlement.

The Appellate Division also concluded that the prosecution had shown

Calvin's intent; *i.e.*, the murder "was the culmination of a cycle of abusive,

controlling behavior that intensified after [Michele] rebuffed his attempts to

prevent the divorce." *Harris*, 928 N.Y.S.2d at 120. In fact, the majority

noted, the "most notable evidence" of Calvin's "threatening and intimidating

behavior" came from Michele's hairdresser, who testified to overhearing the

call where Calvin threatened to make her disappear. *Id*. But according to

Calvin, Mr. Wilczynski's story did not include that damning threat until

Senior Investigator Mulvey directed him to spice it up.

The Appellate Division also recounted the "troubling" physical evidence

presented by the prosecution; *i.e.*, the "recent stains" of Michele's spattered

blood that, as Investigator Andersen testified to the jury, were "still moist"

and could be considered fresh based on their coloration. *Harris*, 928 N.Y.S.2d

at 123. But according to Calvin, the blood evidence had been manipulated

and adulterated. And any claim the blood could be "aged" on sight, or that the blood spatter pattern supported any conclusions, was just junk science.

Notably, the Appellate Division's dissenting Justice argued that even this prosecution-friendly retelling of the evidence against Calvin was legally insufficient to support a conviction for murder. *Harris*, 928 N.Y.S.2d at 126 (Malone, Jr., J., dissenting). The dissenter emphasized that important leads had been ignored by investigators. For instance, despite the fact that Stacy Stewart lacked an alibi and that his truck matched the description offered by Farmer Tubbs, State Police had failed to meaningfully investigate the possibility of Stewart's involvement. *Id*. at 133 (noting the "the only forensic examinations conducted" were done on and around Calvin's property).

In fact, the dissent noted, DA Keene had apparently deliberately avoided an inquiry into a second witness who could have corroborated Farmer Tubb's story. *Harris*, 928 N.Y.S.2d at 138–39. That second witness, a man named John Steele, died in October of 2008 without ever being interviewed as part of the case. *Id*. at 139. Luckily for Calvin, the dissenting Justice granted him leave to further appeal. *People v. Harris*, 932 N.Y.S.2d 28 (2011).

On October 18, 2012, the Court of Appeals vacated the murder conviction and ordered a new trial. *People v. Harris*, 954 N.Y.3d 679 (2012). In a short, six-to-one opinion, the Court of Appeals held, *inter alia*, the trial court had erred during *voir dire* when it failed to "elicit from a prospective juror an

unequivocal assurance of her ability to be impartial after she apprised defense counsel that she had a preexisting opinion as to defendant's guilt or innocence." *Id*. at 684–85.  In light of this issue with seating an impartial jury, the Court of Appeals noted that "publicity attending a third trial may render voir dire significantly burdensome" and cautioned the trial court to "strongly consider changing venue." *Id*. at 687.

With a re-trial in the works, Calvin was let out on bail.  He moved for a change of venue, which was granted.  A third trial in a different county with a new prosecutor ended with a hung jury on May 15, 2015.  The case was re-tried to the bench about a year later.  That trial ended in an acquittal on May 24, 2016.  This civil rights action followed.

## III.  <u>LEGAL STANDARD</u>

The entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  An issue of fact is material for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In assessing whether there are any genuine disputes of material fact, "a court must resolve any ambiguities and draw all inferences from the facts

in a light most favorable to the nonmoving party." *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017) (citation omitted). Summary judgment is inappropriate where a "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted).

## IV.  DISCUSSION

Plaintiff has named as defendants the County, the DA's Office, DA Keene, Senior Investigator Mulvey, Investigator Anderson, Investigator Lester, Ms. Thayer, and two groups of Does. As noted *supra*, the ten-count complaint asserts § 1983 claims for malicious prosecution (Count One), fabrication of evidence (Count Two), a failure to investigate (Count Three), suppression of evidence (Count Four), conspiracy (Count Five), supervisory liability (Count Six), municipal liability (Count Seven), and stigma-plus defamation (Count Eight) as well as state law claims for malicious prosecution (Count Nine) and infliction of emotional distress (Count Ten).

### A.  Preliminary Issues

As an initial matter, however, plaintiff has abandoned half of these claims. Plaintiff has also abandoned all of his claims against Investigator Lester and both groups of Does. Finally, plaintiff's claims against the DA's Office are redundant of his claims against the County and/or DA Keene.

1. **Abandoned Claims**

In his opposition memorandum, plaintiff defends five claims: (1) § 1983 malicious prosecution (Count One); (2) § 1983 fabrication of evidence (Count Two); (3) § 1983 conspiracy (Count Five); (4) § 1983 municipal liability (Count Seven); and (5) state law malicious prosecution (Count Nine).  Pl.'s Opp'n, Dkt. No. 110 at 28–65.

However, plaintiff has not opposed dismissal of his § 1983 claims alleging a failure to investigate (Count Three), the suppression of evidence (Count Four), supervisory liability (Count Six), and stigma-plus defamation (Count Eight).  *See* Pl.'s Opp'n.  Nor has he opposed dismissal of his state law claim alleging the infliction of emotional distress (Count Ten).  *See id.*

"Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."  *Frantti v. New York*, 414 F. Supp. 3d 257, 291 (N.D.N.Y. 2019) (citation omitted).  As the Second Circuit has explained:

> Generally, but perhaps not always, a partial response [to a motion for summary judgment] reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others.  Pleadings often are designed to include all possible claims or defenses, and parties are always free to abandon some of them.  Moreover, preparation of a response to a motion for summary judgment is a particularly appropriate time for a non-movant party to decide whether to pursue or

> abandon some claims or defenses.  Indeed, Rule 56 is
> known as a highly useful method for narrowing the
> issues for trial.

*Jackson v. Fed. Express*, 766 F.3d 189, 196 (2d Cir. 2014).

Upon review, plaintiff has abandoned the undefended claims.  In his

opposition papers, plaintiff has not mounted a defense against the arguments

in favor of dismissal that were advanced by defendants in their opening briefs

as to these five counts.  Accordingly, plaintiff's claims alleging a failure to

investigate (Count Three), the suppression of evidence (Count Four),

supervisory liability (Count Six), defamation (Count Eight), and emotional

distress (Count Ten) have been abandoned and will be dismissed.

## 2. **Investigator Lester**

Plaintiff has also named as a defendant "Unidentified Lester, New York

State Police Investigator."  Unlike the Does, plaintiff readily ascertained this

person's identity: Mark Lester.  Dkt. No. 20 (joining issue on this defendant's

behalf).  The complaint references this defendant in a single paragraph:

> Realizing that it was "now or never" and that "the case
> wasn't getting any better" (as Defendant Investigator
> Lester was quoted in a 48 Hours Mystery, A Time to
> Kill segment [link omitted], the Defendants set out to
> compile a case against Calvin Harris.

Compl. ¶ 33.  But it is unclear what, if anything, discovery in this action

might have unearthed against Lester.  Plaintiff's responsive statement of

facts does not attribute any particular misconduct to him.  Pl.'s Facts, Dkt.

No. 110-1.  Nor is Investigator Lester mentioned anywhere in plaintiff's opposition memorandum.  *See* Pl.'s Opp'n.  In short, there is no indication of any evidence in the record from which a rational jury could conclude that Investigator Lester is liable to plaintiff on one or more of his remaining claims.  Accordingly, Investigator Lester must be dismissed as a defendant.

### 3.  **The Does**

Third, plaintiff has named two groups of Does: "Unidentified Jane/John Doe #1-10 Tioga County Employees" and "Unidentified Jane/John Doe #11-20 New York State Police Employees."  Dkt. No. 1.  Of course, the use of "Doe" as a placeholder for a defendant's true identity is appropriate "until the plaintiff has had some opportunity for discovery to learn the identities of responsible officials."  *Davis v. Kelly*, 160 F.3d 917, 921 (2d Cir. 1998).

However, if the plaintiff has failed to identify and serve the real party in interest before the close of discovery, the placeholder defendant must be dismissed without prejudice.  *Kenney v. Clay*, 172 F. Supp. 3d 628, 642 (N.D.N.Y. 2016); *Coward v. Town & Vill. of Harrison*, 665 F. Supp. 2d 281, 300 (S.D.N.Y. 2009) (collecting cases).  That is the scenario presented in this action.  Accordingly, the Does will be dismissed without prejudice.

### 4.  **The DA's Office**

Fourth, plaintiff has named as a defendant the Tioga County District Attorney's Office.  The capacity of the District Attorney's Office to be sued is

determined by state law.  *See* Fed. R. Civ. P. 17(b).  "Under New York law, departments which are merely administrative arms of a municipality, do not have a legal identity separate and apart from the municipality and cannot sue or be sued."  *Hall v. City of White Plains*, 185 F. Supp. 2d 293, 303 (S.D.N.Y. 2002).

Courts have routinely applied this rule to conclude that "the District Attorney's Office is not a suable entity."  *Woodward v. Office of Dist. Att'y*, 689 F. Supp. 2d 655, 658 (S.D.N.Y. 2010); *Ayers v. Suffolk Cnty. Dist. Att'y Off.*, 2022 WL 4539580, at *3 (E.D.N.Y. Sept. 28, 2022).  Where, as here, a plaintiff names both the municipality and the department as defendants, "courts routinely have dismissed the claims against the department."  *In re Dayton*, 786 F. Supp. 2d 809, 818 (S.D.N.Y. 2011).  Accordingly, the DA's Office must be dismissed as a defendant.[6]

## B.  Remaining Claims

This leaves for consideration plaintiff's claims for (1) § 1983 and state law malicious prosecution (Counts One and Nine); (2) § 1983 fabrication of evidence (Count Two); (3) § 1983 conspiracy (Count Five); and (4) § 1983 municipal liability (Count Seven).

---

[6]  The DA's Office would be immune from plaintiff's § 1983 claims for money damages to the extent it is considered an agency performing a function of the State.  *Woodward*, 689 F. Supp. 2d at 659 (finding Eleventh Amendment immunity).  The same is true of an official-capacity claim for money damages against the District Attorney himself.  *See, e.g.*, *Ying Li v. City of N.Y.*, 246 F. Supp. 3d 578, 640–41 (E.D.N.Y. 2017).

**1. <u>Malicious Prosecution</u>** (Counts One and Nine)

In Counts One and Nine, plaintiff asserts malicious prosecution claims under § 1983 and related state law.  Plaintiff opposes the dismissal of these claims against Senior Investigator Mulvey, Investigator Andersen, and DA Keene.  *See* Pl.'s Opp'n at 29–46.

**i. <u>Timeliness</u>**

As an initial matter, the State defendants argue that plaintiff's § 1983 malicious prosecution claim is time-barred, at least to the extent it relies on conduct related to the first indictment, because that § 1983 claim accrued when the first indictment was dismissed by the trial court in 2007.  State Mem., Dkt. No. 101-38 at 14–15.  The County defendants agree that the fact pattern presented in this case raises a difficult question of timing, but they argue that the limitations period as to DA Keene began running when he left the DA's Office in 2012.  County Mem., Dkt. No. 100-1 at 13–17.

"Claims under section 1983 are governed by the statute of limitations and tolling rules provided by analogous state law."  *Bailey v. City of N.Y.*, 79 F. Supp. 3d 424, 440 (E.D.N.Y. 2015) (citing *Bd. of Regents v. Tomanio*, 446 U.S. 478, 483–92 (1980)).  "In New York, the statute of limitations applicable to section 1983 claims is three years."  *Id.*  Generally speaking, a § 1983 claim accrues when the plaintiff "knows or has reason to know of the injury which

is the basis of his action." *Ormiston v. Nelson*, 117 F.3d 69, 70 (2d Cir. 1997)

(quoting *Singleton v. City of N.Y.*, 632 F.2d 185, 191 (2d Cir. 1980)).

Importantly, however, the question of when this § 1983 claim accrues (and

thus when the limitations period begins to run) is determined by reference to

federal law. *Ormiston*, 117 F.3d at 71. "In malicious prosecution suits under

Section 1983, the statute of limitations begins to run when the prosecution

terminates in the plaintiff's favor." *Spak v. Phillips*, 857 F.3d 458, 462 (2d

Cir. 2017) (cleaned up). And for the purpose of claim accrual under federal

law, a so-called "favorable termination" does not occur until the prosecution

against the plaintiff has "conclusively" ended. *Id.* (citing *Murphy v. Lynn*, 53

F.3d 547, 548 (2d Cir. 1995).

Measured against this general body of law, the State defendants are right

about the first indictment: any § 1983 malicious prosecution claim based

solely on misconduct related to that indictment, which was obtained in 2005

and dismissed by the trial court in 2007, would be time-barred. That holds

true even though the state court's dismissal of the first indictment turned out

to be far from the end of the criminal proceedings against plaintiff.

This might seem to be an unusual result. But it rests on binding Second

Circuit precedent, which is focused on the technical distinction between the

two accusatory instruments rather than society's colloquial understanding of

a criminal "case." In *Spak v. Phillips*, the Second Circuit considered the

question of whether the plaintiff's § 1983 malicious prosecution claim accrued

on the date that a prosecutor entered a *nolle prosequi*, a peculiar feature of

Connecticut state criminal law:

> Under Connecticut law, a prosecutor may decline to prosecute a case by entering a *nolle prosequi*. The effect of a *nolle* is to terminate a particular prosecution against the defendant. However, a *nolle prosequi* is not the equivalent of a dismissal of a criminal prosecution with prejudice, because jeopardy does not attach. The statute of limitations on the *nolled* charge continues to run, and the prosecutor may choose to initiate a second prosecution at any time before the limitations period expires. A prosecution can only be reinstituted following a *nolle*, however, by the filing of a new charging document and a new arrest.

857 F.3d 458, 463 (2d Cir. 2017) (cleaned up).

As relevant here, the prosecutor's decision to *nolle* a criminal charge does

not preclude the prosecutor from initiating a second prosecution against the

defendant based on the same alleged conduct. *Spak*, 857 F.3d at 463. The

prosecutor just has to obtain a second charging instrument, such as another

grand jury indictment. *Id*.

With that in mind, the filing of a *nolle prosequi* does not really sound like

the kind of "favorable termination" that "conclusively" ends an underlying

prosecution for purposes of § 1983 claim accrual. But the Second Circuit

explicitly held otherwise in *Spak*: there, the panel concluded that the

prosecutor's entry of the *nolle prosequi* started the clock on the limitations period for the plaintiff's § 1983 malicious prosecution claim.

As the Circuit explained, "[s]o long as a particular prosecution has been 'conclusively' terminated in favor of the accused, such that the underlying indictment or criminal information has been vacated and cannot be revived, then the plaintiff has a justiciable claim for malicious prosecution." *Spak*, 857 F.3d at 464.  "At that point, all of the issues relevant to the claim—such as malice and lack of probable cause—are ripe for adjudication." *Id*.

In the Circuit's view, it was irrelevant that a *nolle prosequi* leaves open the possibility that the § 1983 plaintiff might sooner or later be re-charged for the same criminal conduct because, as a technical matter, the new charge would arise from a new charging instrument.

Of course, this case involves a criminal prosecution under the laws of the State of New York, not those of Connecticut.  And unlike the fact pattern in *Spak*, the first indictment in this case was dismissed by the trial court, not by some unilateral act of DA Keene.  But the result is the same.

For instance, in *Sharp v. County of Putnam*, the § 1983 plaintiff was initially indicted on certain criminal charges under New York law.  2019 WL 2250412, at *2 (S.D.N.Y. May 24, 2019).  After the state court dismissed the indictment, the plaintiff brought a § 1983 malicious prosecution claim against

several of the law enforcement officials who initiated the underlying criminal prosecution against him.  *Id.*

As relevant here, the district court concluded that the plaintiff's § 1983 malicious prosecution claim had accrued on the date that the state trial court issued its decision dismissing the indictment.  *Sharp*, 2019 WL 2250412, at *5.  This was so, the court reasoned, even though the state court's dismissal of the indictment had explicitly given the prosecutor "leave to re-present to a new Grand Jury."  *Id.*

The district court relied on this Circuit's decision in *Spak* to conclude that the plaintiff's § 1983 malicious prosecution claim was "ripe for adjudication" the moment the indictment was dismissed, "notwithstanding the fact that the prosecution could have chosen to prosecute" the plaintiff "for the same criminal conduct by re-presenting the case to a grand jury and obtaining a separate charging instrument."  *Sharp*, 2019 WL 2250412, at *5 (cleaned up).

The same thing happened with the first indictment in this case.  The state court dismissed the 2005 indictment "with leave to the District Attorney to apply for an order permitting resubmission of the charge to another Grand Jury."  *Harris*, 838 N.Y.S.2d at 353.  For purposes of claim accrual, the state court's dismissal of the first indictment "terminate[d] a specific prosecution by vacating [the] charging instrument."  *Spak*, 857 F.3d at 464.  Under this rule, it does not matter that DA Keene could have (and quickly did) obtain

another indictment.  *Id*. at 465 ("[W]e read our precedent . . . to counsel only against duplicative litigation on issues of guilt and probable cause arising out of the same accusatory instrument.").

Importantly, though, this conclusion about the first indictment does not lead to the dismissal of plaintiff's § 1983 malicious prosecution claim.  The plaintiff in *Spak* was not re-charged after the prosecutor entered the *nolle prosequi*.  And the plaintiff in *Sharp* was never re-indicted after the state court dismissed the prosecutor's case.  Here, however, DA Keene obtained a second accusatory instrument: the February 2007 indictment.

The criminal prosecution on the second indictment dragged on until plaintiff received a conclusive, "favorable termination"; *i.e.*, the acquittal in 2016.  And there is no dispute that plaintiff filed this § 1983 action within three years of that acquittal.  Because § 1983 claims rely on basic principles of causation that are borrowed from tort law, plaintiff is still able to pursue his § 1983 malicious prosecution claim to the extent that any of the alleged misconduct is traceable to proceedings on this second indictment.  *See Barnes v. Anderson*, 202 F.3d 150, 158 (2d Cir. 1999).

To hold otherwise would leave plaintiff without a remedy for official misconduct just because it was causally related to what, in retrospect, could be parsed as multiple or perhaps repetitive constitutional harms giving rise to distinct § 1983 claims.  For example, imagine if plaintiff filed his § 1983

malicious prosecution claim right after the trial court dismissed the first indictment in January of 2007.  Under Second Circuit precedent, a § 1983 malicious prosecution claim *as to that prosecution* accrued at that time.[7]

But imagine too that, as was the case here, the prosecutor sought and obtained a second indictment by presenting some of the same or similar evidence (along with perhaps some additional evidence) to a second grand jury.  Plaintiff could not have brought a § 1983 malicious prosecution claim based on this second indictment until his acquittal in 2016.  So there is no doubt that a § 1983 malicious prosecution claim accrued at that time as well.

The fact that one or more of the defendants might have engaged in the same or similar misconduct in both "prosecutions" would not be a defense to a § 1983 malicious prosecution claim based on the second indictment.  After all, plaintiff's claim is that the defendants fabricated material evidence in order to obtain the second indictment.  Thus, to the extent that plaintiff can tie any of the alleged misconduct to the proceedings related to the second indictment, plaintiff's § 1983 malicious prosecution claim remains timely.

---

[7]  Plaintiff probably could not have brought this claim in 2007.  At that time, binding Second Circuit precedent on the "favorable termination" *element* of this § 1983 claim required the plaintiff to show that a particular prosecution ended "not merely without a conviction, but also with some affirmative indication of his innocence."  *Thompson v. Clark*, 142 S. Ct. 1332, 1336 (2022) (explaining state of Second Circuit precedent and overruling same).

The County defendants offer an alternative accrual date, as least as to plaintiff's § 1983 malicious prosecution claim against DA Keene.[8]  County Mem. at 13–17.  In their view, the limitations period on this claim should have begun running as to DA Keene "at the time the New York Court of Appeals invalidated [the] conviction and [DA] Keene left office."  *Id*. at 14.

This argument is also rejected.  It too runs afoul of our Circuit precedent, which is not concerned with the prosecutor's employment status.  Instead, we measure accrual on a § 1983 malicious prosecution claim from the date on which "a particular prosecution has been 'conclusively' terminated in favor of the accused," an event which does not happen until the underlying accusatory instrument "has been vacated and cannot be revived."

Although the New York Court of Appeals vacated plaintiff's conviction in 2012, it did not dismiss the indictment against him.  *Harris*, 19 N.Y.3d at 679.  Plaintiff was tried twice more on this indictment before he was finally acquitted in 2016.  This "favorable termination" is what "conclusively" ended

---

[8]  In support of this argument, the County defendants' brief quotes extensively from *Poventud v. City of N.Y.*, 750 F.3d 121 (2d Cir. 2014) (en banc).  There, the Second Circuit opined that § 1983 claims based on an alleged violation of *Brady v. Maryland*, 373 U.S. 83 (1963), would not be barred by a pending re-trial on the same underlying offense.  To the extent this analysis remains relevant, the Court notes that plaintiff has abandoned his § 1983 claim based on the suppression of evidence.

that criminal proceeding against him.  Accordingly, the County defendants'

timeliness argument will be rejected.[9]

## ii. **The Merits**

To prevail on a claim for malicious prosecution under § 1983 or New York

law, a plaintiff must show: (1) the initiation or continuation of a criminal

proceeding by the defendant against the plaintiff; (2) the termination of that

criminal proceeding in the plaintiff's favor; (3) a lack of probable cause for

commencing the criminal proceeding; and (4) that actual malice motivated

the defendant's actions.  *See Dettelis v. Sharbaugh*, 919 F.3d 161, 163–64 (2d

Cir. 2019).  A § 1983 claim also requires "a sufficient post-arraignment liberty

restraint to implicate the plaintiff's Fourth Amendment rights."  *Buari v. City

of N.Y.*, 530 F. Supp. 3d 356, 383 (S.D.N.Y. 2021) (quoting *Rohman v. N.Y.

City Trans. Auth.*, 215 F.3d 208, 215 (2d Cir. 2000)).

---

[9]  In discussing timeliness, it bears noting that the Supreme Court has recently weighed in on this general area of § 1983 law.  In *McDonough v. Smith*, 139 S. Ct. 2149 (2019), the Court held that the limitations period on a § 1983 fabricated-evidence claim did not begin to run until a plaintiff was acquitted in the underlying criminal action.  And in *Thompson v. Clark*, 142 S. Ct. 1332 (2022), the Court held that the "favorable termination" element of a § 1983 malicious prosecution claim only required a plaintiff to show the prosecution ended without a conviction, rather than some affirmative indication of innocence.  Neither of these decisions explicitly repudiate the Second Circuit's claim accrual rule in *Spak—Thompson* dealt with the substantive element of a § 1983 malicious prosecution claim, not the distinct question of claim accrual.  However, as plaintiff notes in his opposition, the Court's analysis in *McDonough* casts doubt on whether the Circuit's narrow, restrictive claim accrual rule should apply to an unusual fact pattern like the one in this case.

### a. **State Defendants**

The State defendants argue that plaintiff's malicious prosecution claims must be dismissed because plaintiff "cannot establish that any of the State Defendants took an active role in the prosecution." State Mem. at 15. As they point out, DA Keene testified that "the decision to present the case against Plaintiff to the grand jury was his alone." *Id*. The State defendants also argue that plaintiff cannot rebut the presumption of probable cause that arises from the second indictment. *Id*. at 16–18. Finally, defendants argue that "the record is devoid of any admissible evidence of malice." *Id*. at 19.

Upon review, these arguments must be rejected. "A claim for malicious prosecution against a police officer 'requires some showing that the defendant distorted the process by which [the] plaintiff was brought to trial.'" *Buari*, 530 F. Supp. 3d at 383 (quoting *Bailey*, 79 F. Supp. 3d at 449). Viewed in the light most favorable to plaintiff, the record evidence is sufficient to establish that one or both of the State defendants initiated the criminal proceedings against plaintiff in the absence of probable cause and with actual malice.

First, plaintiff has identified evidence from which a rational jury could conclude that one or both of the State defendants "initiated" the prosecution against him. "Showing that the police 'failed to make a complete and full statement of facts to the District Attorney, misrepresented or falsified evidence, withheld evidence or otherwise acted in bad faith' satisfies the

initiation element of malicious prosecution.'" *Buari*, 530 F. Supp. 3d at 383 (quoting *Manganiello v. City of N.Y.*, 612 F.3d 149, 160 (2d Cir. 2010)).

For instance, there is evidence tending to show that Senior Investigator Mulvey pressured DA Keene into presenting the case to a grand jury after four years of investigation and delays.  That conclusion might be supported, in part, by DA Keene's apologetic e-mail sent after this conversation.  *Townes v. City of N.Y.*, 176 F.3d 138, 147 (2d Cir. 1999) (holding this element can be satisfied with evidence the police "misled or pressured" the prosecutor).

In addition, there is evidence tending to show that Investigator Andersen, possibly with the involvement of Senior Investigator Mulvey, fabricated material evidence related to the blood discovered near the entryway to the house.  There is also some evidence tending to show that Senior Investigator Mulvey instigated or possibly coerced witnesses into changing their stories in material ways.  This misrepresented and/or falsified evidence was forwarded to DA Keene and used in the prosecution.

 Second, plaintiff has identified evidence from which a jury could conclude that the State defendants acted in the absence of probable cause and with actual malice.  "Probable cause to prosecute exists when there are such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff is guilty."  *Bailey*, 79 F. Supp. 3d at 450 (cleaned up).  As relevant here, "[a] grand jury indictment creates a presumption of probable cause that

'may be rebutted only by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" *Buari*, 530 F. Supp. 3d at 384 (quoting *Manganiello*, 612 F.3d at 162).  "The plaintiff bears the burden of proof in rebutting the presumption of probable cause that arises from the indictment." *Id.* (cleaned up).

Viewed in the light most favorable to plaintiff, a rational jury could find that plaintiff has rebutted this presumption.  Plaintiff has identified evidence tending to show that Investigator Andersen, with the involvement of Senior Investigator Mulvey, generated false or misleading forensic evidence related to the blood spatter found in the house and staged misleading photographs of this forensic evidence.  This evidence was shared with DA Keene, presented to the grand jury, and used at trial.  There is also evidence tending to show that the potentially exculpatory information related to the blood evidence; *i.e.*, attorney Keene's handwritten notes about Michele cutting her hand on some ice, were withheld or suppressed.

For purposes of summary judgment, plaintiff's showing related to the misleading or fabricated evidence is also sufficient to create a fact question on actual malice, which is established when "the defendant . . . commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Buari*, 530 F. Supp. 3d at 385 (citation omitted).  As relevant here, "[a] lack of probable cause generally

creates an inference of malice." *Id*. (cleaned up).  In addition, "[f]alsifying

evidence is sufficient to show malice." *Id*.  In short, the disputed facts related

to the existence of probable cause, and in particular the disputes over the

alleged fabrication or manipulation of evidence discussed *infra*, give rise to a

related jury question on malice.  Accordingly, the State defendants' motion

for summary judgment on the malicious prosecution claims will be denied.

### b. **County Defendants**

The County defendants argue that plaintiff's malicious prosecution claims

must be dismissed because DA Keene is entitled to absolute prosecutorial

immunity.  County Mem. at 11–13.  Alternatively, the County defendants

argue that plaintiff did not suffer a liberty restraint after 2012 because he

was released from prison after the New York Court of Appeals vacated his

conviction.  *Id*. at 27.  In opposition, plaintiff acknowledges the broad scope of

prosecutorial immunity but argues the doctrine does not shield DA Keene

from certain pre-indictment "investigative" conduct.  Pl.'s Opp'n at 59–63.

"The doctrine of absolute immunity applies broadly to shield a prosecutor

from liability for money damages (but not injunctive relief) in a § 1983

lawsuit, even when the result may be that a wronged plaintiff is left without

an immediate remedy." *Anilao v. Spota*, 27 F.4th 855, 863 (2d Cir. 2022)

(citing *Imbler v. Pachtman*, 424 U.S. 409, 427 (1976)).  Instead of § 1983

damages liability, courts have "pointed to other methods, such as criminal and professional sanctions, to deter and redress wrongdoing." *Id*. at 863 n.3.

This immunity "attaches to prosecutorial functions that are intimately associated with initiating or presenting the State's case." *Flagler v. Trainor*, 663 F.3d 543, 547 (2d Cir. 2011).  The doctrine covers "virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate." *Anilao*, 27 F.4th at 864 (citing *Hill v. City of N.Y.*, 45 F.3d 653, 661 (2d Cir. 1995)).  "For example, a prosecutor enjoys absolute immunity when determining which offenses to charge, initiating a prosecution, presenting a case to a grand jury, and preparing for trial." *Id*.

Indeed, this grant of immunity even shields improper advocacy activities, such as "the falsification of evidence and the coercion of witnesses," *Taylor v. Kavanagh*, 640 F.2d 450, 452 (2d Cir. 1981), "conspiring to present false evidence at a criminal trial," *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994), "the knowing use of perjured testimony," *Imbler*, 424 U.S. at 431 n.34, "the deliberate withholding of exculpatory information," *id*., and the making or eliciting of "false or defamatory statements in judicial proceedings," *Burns v. Reed*, 500 U.S. 478, 490 (1991).

"In determining whether a prosecutor is entitled to absolute immunity, courts apply a 'functional' test, 'looking to the function being performed rather than to the office or identity of the defendant." *Buari*, 530 F. Supp. 3d

at 378 (quoting *Hill v. City of N.Y.*, 45 F.3d 653, 660 (2d Cir. 1995)).  This "functional" test is an objective one.  *See, e.g.*, *Giraldo v. Kessler*, 694 F.3d 161, 165 (2d Cir. 2012)).  In other words, "[c]ourts must view the relevant circumstances as would a reasonable official in the claimant's position, and consider whether a reasonable prosecutor would view the acts challenged by the [plaintiff] as reasonably within the functions of a prosecutor." *Buari*, 530 F. Supp. 3d at 378 (cleaned up).

Importantly, however, "absolute immunity does not thwart every claim against prosecutors." *Buari*, 530 F. Supp. 3d at 379.  "Under the functional test, 'absolute immunity may not apply when a prosecutor is not acting as "an officer of the court," but is instead engaged in other tasks, say, investigative or administrative tasks.'" *Id*. (quoting *Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009)).  "Investigative tasks beyond the scope of absolute immunity are those 'normally performed by a detective or police officer.'" *Id*. (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)).[10]

Measured against this body of law, DA Keene is absolutely immune from a significant amount of the alleged misconduct identified in plaintiff's version of events.  This would include things such as DA Keene's role as an advocate

---

[10] "Where absolute immunity does not apply, a prosecutor is eligible only for qualified immunity." *Buari*, 530 F. Supp. 3d at 379 (citing *Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998)).

during the grand jury presentations and at the trials in which he participated as the prosecutor.  Indeed, plaintiff seems to recognize as much.

However, plaintiff emphasizes that the "investigative phase" of the case against him dragged on for four years before DA Keene even attempted to seek the first indictment.  During that prolonged period of time, DA Keene traveled with State Police to Albany, where they presented their case to a Forensic Unit "to evaluate the need for further investigations."  Pl.'s Opp'n at 61.  DA Keene also traveled with Senior Investigator Mulvey to Boston, where they interviewed Calvin's ex-wife.  *Id.*

In addition, plaintiff points out that DA Keene testified that he "instigated witness interviews independent from police prompting," and that he "had a general practice of speaking with witnesses before they testified in the grand jury."  Pl.'s Opp'n at 61–62.  Plaintiff also argues there is evidence tending to show that DA Keene was a participant in the manipulation or fabrication of material blood evidence and of certain key witness testimony.  *Id.* at 37.

"There is no bright line for absolute immunity based on the stage of a criminal proceeding."  *Buari*, 530 F. Supp. 3d at 379.  As a general matter, though, the doctrine applies "where some type of formal proceeding had been commenced or was being commenced by the conduct at issue."  *Id.* (citation omitted).  However, the doctrine is generally inapplicable "where formal

proceedings have not begun and the prosecutor is acting in an investigative

capacity." *Id.* As the Supreme Court explained:

> [t]here is a difference between the advocate's role in
> evaluating evidence and interviewing witnesses as he
> prepares for trial, on the one hand, and the detective's
> role in searching for the clues and corroboration that
> might give him probable cause to recommend that a
> suspected be arrested, on the other hand.

*Buckley*, 509 U.S. at 273.

Viewed in the light most favorable to plaintiff, prosecutorial immunity

would not attach to DA Keene's pre-indictment investigative activity because

it occurred before the existence of probable cause. Generally speaking, "[t]he

investigative acts that are entitled to only qualified immunity are those

undertaken in the phase of law enforcement that involves the gathering and

piecing together of evidence for indications of criminal activities and

determination of the perpetrators." *Giraldo*, 694 F.3d at 166 (citing *Smith*,

694 F.3d at 166).

As discussed in more detail *infra*, DA Keene's alleged misconduct during

the four-year pre-indictment investigative phase gives rise to jury questions

on plaintiff's § 1983 claims for fabrication of evidence and conspiracy. The

same conclusion holds true with respect to plaintiff's malicious prosecution

claims because they are intertwined with, and related to, his claim about the

alleged fabrication of material evidence. *Cf. Harasz v. Katz*, 239 F. Supp. 3d

461, 503 (D. Conn. 2017) (noting analytical overlap between fabrication-of-evidence and malicious prosecution claims under certain circumstances).

It is worth recognizing that in the ordinary case it would be impossible to satisfy the "initiation" element of a malicious prosecution claim against the prosecutor. After all, "a prosecutor unquestionably acts as an advocate—and therefore receives absolute immunity—when she initiates and pursues a criminal prosecution." *D'Alessandro v. City of N.Y.*, 713 F. App'x 1, 5 (2d Cir. 2017) (summary order); *see also Shmueli v. City of N.Y.*, 424 F.3d 231, 236–38 (2d Cir. 2005) (finding prosecutor absolutely immune from claim for malicious prosecution "based solely on events following . . . arraignment").

However, courts have also held that the "initiation" element of a malicious prosecution claim may be satisfied if a defendant fabricates evidence that is material to the probable cause determination. *McDaniel v. City of N.Y.*, 585 F. Supp. 3d 503, 516–17 (S.D.N.Y. 2022) (collecting cases). Accordingly, obtaining false witness statements and participating in the fabrication of material physical evidence for the purpose of obtaining probable cause would be sufficient to sustain this claim; *i.e.*, a jury could conclude that DA Keene, acting in a pre-indictment investigative capacity, "initiated" the proceeding against plaintiff in the absence of probable cause and with actual malice. *Cf. Milstein v. Cooley*, 257 F.3d 1004, 1011 (9th Cir. 2001) (rejecting immunity defense where prosecutor allegedly fabricated evidence material to probable

cause before empaneling a grand jury).  Because the prosecutor bears the burden of demonstrating that absolute immunity applies as a matter of law, *Buari*, 530 F. Supp. 3d at 378, the County defendants' motion for summary judgment on the malicious prosecution claims will be denied.

As a final matter, the County defendants argue that plaintiff did not suffer a sufficient liberty restraint because he was released from prison after the New York Court of Appeals vacated his conviction in 2012.  But plaintiff was still under indictment, which required him to attend court proceedings and obey the conditions of his release.  Those obligations are enough to satisfy this element for purposes of § 1983.  *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003).  Accordingly, this argument will also be rejected.

## 2. **Fabrication of Evidence** (Count Two)

In Count Two, plaintiff asserts a § 1983 claim alleging the fabrication of evidence used against him.  Plaintiff opposes the dismissal of this claim against Senior Investigator Mulvey, Investigator Andersen, DA Keene, and Ms. Thayer.  "To succeed on a fabricated-evidence claim, a plaintiff must establish that an (1) investigating official (2) fabricated information (3) that is likely to influence a jury's verdict, (4) forwarded that information to prosecutors, and (5) the plaintiff suffered a deprivation of life, liberty, or property as a result."  *Ashley v. City of N.Y.*, 992 F.3d 128, 139 (2d Cir. 2021) (cleaned up).

### i. **State Defendants**

The State defendants argue that this claim must be dismissed because plaintiff has not identified any affirmative evidence to support his theory of harm. State Mem. at 19–22. Even assuming otherwise, the State defendants argue the existence of probable cause independent of any allegedly fabricated evidence would defeat this claim. *Id*. at 22. In opposition, plaintiff responds that "the record evidence in this case creates an inference of several different instances of fabrication by the State defendants." Pl.'s Opp'n at 49.

In particular, plaintiff points to: (1) "the adulteration of blood before it was photographed, whose shape was then relied upon to indicate blunt force"; (2) "the fabrication of photographs themselves, which were manipulated to enhance the redness of blood to make it appear new"; and (3) "the tampering of several witnesses, whose accounts were then relied upon in the grand jury and at trial." Pl.'s Opp'n at 49.

Upon review, the State defendants' motion for summary judgment on this claim must be denied. As relevant here, liability on a fabricated-evidence claim hinges on the "knowing creation of false or misleading evidence by a government officer acting in an investigative capacity." *Morse v. Fusto*, 804 F.3d 538, 541 (2d Cir. 2015). Importantly, "probable cause is not a defense to a fair trial claim based on the fabrication of evidence." *Frost v. N.Y. City Police Dep't*, 980 F.3d 231, 248 (2d Cir. 2020).

Viewed in the light most favorable to plaintiff, there is sufficient evidence from which a jury could conclude that Investigator Andersen knowingly generated misleading or even false forensic evidence in connection with the blood and then forwarded that information to prosecutors.  There is also evidence tending to show that Investigator Andersen and Senior Investigator Mulvey knowingly manipulated photographs of the blood evidence that was forwarded to prosecutors, too.  In addition, a jury could conclude from the record evidence that Senior Investigator Mulvey manipulated or coerced key witnesses into changing their stories to "become more inculpatory" and then forwarded that information to prosecutors as well.

Without a murder weapon, a body, or an eyewitness, the forensic and photographic evidence about the blood as well as the witness testimony used to establish a timeline, motive, and intent were all crucial to the State's case and were therefore highly likely to influence a jury's verdict.[11]  As plaintiff

---

[11]  With the exception of Ms. Thayer, the parties do not discuss how, if at all, the Supreme Court's holdings in *Briscoe v. LaHue*, 460 U.S. 325 (1983), or *Rehberg v. Paulk*, 566 U.S. 356 (2012), might impact the proof at trial.  In *Briscoe*, the Court held that a witness is absolutely immune from any § 1983 claims based on his trial testimony.  And in *Rehberg*, the Court extended that protection to grand jury witnesses, even if the plaintiff alleges that the witness committed perjury.  As a result, a defendant's grand jury testimony cannot be used "as substantive evidence to impose civil liability for malicious prosecution or denial of the right to a fair trial."  *Bertuglia v. City of N.Y.*, 133 F. Supp. 3d 608, 642 (S.D.N.Y. 2015).  Notably, however, the Second Circuit has recognized that grand jury testimony remains admissible "on summary judgment or at trial for a purpose other than for its truth, for example, for impeachment."  *Coggins v. Buonora*, 776 F.3d 108, 113 n.8 (2d Cir. 2015); *see also Marshall v. Randall*, 719 F.3d 113, 117 (2d Cir. 2013); *Shabazz v. Kailer*, 201 F. Supp. 3d 386, 392 (S.D.N.Y. 2016) (rejecting *Rehberg*'s application to allegation that police officer "signed a false affidavit and falsified photographic evidence" that was forwarded to prosecutors and later used in grand jury proceedings).

points out, most of the State defendants' arguments in favor of summary judgment boil down to implicit or even explicit credibility determinations running in their favor. And to be sure, a jury could hear the evidence in this case and side with the State defendants. But credibility determinations are inappropriate on summary judgment. Accordingly, the State defendants' motion for summary judgment on this claim will be denied.

## ii. **County Defendants**

The County defendants argue that this claim is also barred by absolute immunity because it involves DA Keene's conduct as an advocate during the criminal proceedings. *See* County Mem. at 11–13. But as explained *supra*, to the extent that evidence in the record would permit a fact-finder to conclude that DA Keene was acting in a pre-indictment investigative capacity for the first four years, he is shielded only by qualified immunity.

Viewing that record evidence in the light most favorable to plaintiff, a reasonable jury could conclude that DA Keene, acting in a pre-indictment investigative capacity, participated in the fabrication of certain material evidence, including the manipulation of the blood evidence and the elicitation of misleading or false testimony from certain witnesses. As the Supreme Court has observed, "[a] prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively

described as 'preparation' for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial." *Buckley*, 509 U.S. at 276.

Indeed, the Second Circuit has repeatedly concluded that a prosecutor can be held liable for the kind of misconduct claimed here. *Morse v. Fusto*, 804 F.3d 538, 547–48 (2d Cir. 2015) (affirming verdict against prosecutors who "knowingly created false or misleading" evidence that was later "determined to be material to the grand jury's decision to indict"); *Zahrey v. Coffey*, 221 F.3d 342, 347 (2d Cir. 2000) (reversing trial court's application of qualified immunity where the complaint alleged that prosecutor fabricated evidence while acting in an investigative capacity). Accordingly, the County defendants' motion for summary judgment on this claim will be denied.

### iii. **Ms. Thayer**

Ms. Thayer argues this claim must be dismissed because her conduct did not amount to "state action," a prerequisite to any civil rights claim brought under 42 U.S.C. § 1983. Thayer Mem., Dkt. No. 97-4 at 9–13. In opposition, plaintiff argues that Ms. Thayer's alleged conduct qualifies as "state action" because "she was a willful participant in joint activity with the State Police that evinced an eagerness to work alongside them that far surpasses the endeavors of ordinary civilians." Pl.'s Opp'n at 55.

"[S]tate action requires both an alleged constitutional deprivation 'caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible' and that 'the party charged with the deprivation must be a person who may fairly be said to be a state actor.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)).

As the Supreme Court has recognized, "there is no single test to identify state actions and state actors." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 294 (2001).  Although a host of factors can bear on this question, three main tests have emerged:

> For purposes of section 1983, the actions of a nominally private entity are attributable to the state when: (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the state," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the state ("the public function test").

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (cleaned up).

Measured against this body of law, Ms. Thayer's motion for summary judgment on this claim must be denied.  "The touchstone of joint action with

the state is often a plan, prearrangement, conspiracy, custom, or policy shared by the private actor and the police." *Savarese v. City of N.Y.*, 547 F. Supp. 3d 305, 340 (S.D.N.Y. 2021) (cleaned up).  For reasons discussed *infra*, a reasonable jury could conclude that Ms. Thayer engaged in willful "joint action" in the form of a conspiracy to help fabricate material evidence against plaintiff that was then used to falsely convict him of murder.  Accordingly, Ms. Thayer's motion for summary judgment on this claim will be denied.

### 3.  **Conspiracy** (Count Five)

In Count Five, plaintiff asserts a § 1983 conspiracy claim.  Plaintiff opposes the dismissal of this claim against Senior Investigator Mulvey, DA Keene, and Ms. Thayer.  Pl.'s Opp'n at 55–59.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Butler v. Hesch*, 286 F. Supp. 3d 337, 363 (N.D.N.Y. 2018) (D'Agostino, J.).

A conspiracy is the kind of secretive operation that "may have to be proven by circumstantial, rather than direct, evidence." *Moroughan v. Cnty. of Suffolk*, 514 F. Supp. 3d 479, 529 (E.D.N.Y. 2021).  However, "[t]o survive a motion for summary judgment, a plaintiff's evidence of a § 1983 conspiracy must, at least, reasonably lead to the inference that the defendants positively

or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Id.* (cleaned up).

Viewed in the light most favorable to plaintiff, a reasonable jury could conclude that Senior Investigator Mulvey, DA Keene, and/ or Ms. Thayer conspired to fabricate material evidence intended to deprive plaintiff of his liberty.  As before, plaintiff correctly notes that defendants' arguments to the contrary rely on the kind of credibility determinations that are forbidden on summary judgment.  Accordingly, defendants' motions for summary judgment on this claim will be denied.

**4**.  **<u>Municipal Liability</u>** (Count Seven)

In Count Seven, plaintiff asserts a § 1983 municipal liability claim.  The County defendants argue that this claim must be dismissed because plaintiff has failed to identify any municipal policy, custom, or practice that gave rise to a constitutional violation.  County Mem. at 21–23.  In opposition, plaintiff responds that defendants' argument "overlooks the most straightforward form of *Monell* liability in cases of this nature: wrongdoing of an official policymaker, such as District Attorney Keene."  Pl.'s Opp'n at 63.

In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the Supreme Court held that a municipality can be liable under § 1983 if a plaintiff demonstrates that an underlying constitutional violation was caused by a municipal "policy or custom."  But *Monell* does not permit a plaintiff to hold a municipal entity

liable under § 1983 simply because it employed the tortfeasor.  Instead,

"under § 1983[ ] local governments are responsible only for 'their *own* illegal

acts.'"  *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (emphasis in original)

(quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)).

"[T]o establish municipal liability under 42 U.S.C. § 1983, a plaintiff must

demonstrate that the deprivation of his constitutional right was 'caused by a

governmental custom, policy or usage of the municipality.'"  *Deferio v. City of

Syracuse*, 770 F. App'x 587, 589 (2d Cir. 2019) (summary order) (quoting

*Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012)).  "The policy or

custom need not be memorialized in a specific rule or regulation," *Kern v. City

of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996), and may be "reflected in either

action or inaction," *Cash v. Cnty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011).

Measured against this body of law, the County defendants' motion for

summary judgment on this claim must be denied.  "It is well-established that

*Monell* liability attaches 'where a single act is taken by a municipal employee

who, as a matter of [s]tate law, has final policymaking authority in the areas

in which the action was taken.'"  *Galgano v. Cnty. of Putnam*, 2020 WL

3618512, at *11 (S.D.N.Y. July 2, 2020) (quoting *Newton v. City of N.Y.*, 566

F. Supp. 2d 256, 271 (S.D.N.Y. 2008)).  As relevant here, the Second Circuit

has held that "the actions of county prosecutors in New York are generally

controlled by municipal policymakers for purposes of *Monell*, with a narrow

exception . . . being the decision of whether, and on what charges, to prosecute." *Bellamy v. City of N.Y.*, 914 F.3d 727, 759 (2d Cir. 2019).

Viewed in the light most favorable to plaintiff, there is sufficient evidence in the record from which a rational jury could conclude that DA Keene, the final policymaker for Tioga County, participated in or directed the fabrication or manipulation of material blood evidence and engaged in or led an effort to coerce key witnesses into modifying or falsifying their stories prior to giving their testimony at grand jury or at trial.  Accordingly, the County defendants' motion for summary judgment on this claim will be denied.

## C.  **Qualified Immunity**

As a final matter, the State defendants argue they are entitled to qualified immunity from plaintiff's § 1983 claims because they gathered their evidence against plaintiff in good faith and did not purposefully coerce any witnesses into changing their stories.[12]  State Mem. at 31–33.  In opposition, plaintiff responds that disputes of fact preclude summary judgment on his malicious prosecution and fabrication-of-evidence claims.  Pl.'s Opp'n at 65–66.

The doctrine of "[q]ualified immunity protects government officials from civil damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person

---

[12]  The County defendants also raise this argument in their reply.  Dkt. No. 119.

would have known.'" *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  Under the two-step framework articulated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), to defeat qualified immunity a plaintiff must show that (1) the official violated a statutory or constitutional right (2) that was "clearly established" at the time of the challenged conduct.  *Francis v. Fiacco*, 942 F.3d 126, 139 (2d Cir. 2019).  Notably, however, step two of this straightforward-seeming inquiry has proven challenging in practice.  *See, e.g.*, *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019) ("The second question—whether the officer violated clearly established law—is a doozy.").

To help clarify the qualified immunity analysis, the Second Circuit has sometimes broken it into three discrete inquiries: (1) whether the plaintiff has established that the defendant violated a constitutional right; (2) if so, whether that right was "clearly established"; and (3) even if that right was "clearly established," whether it was still "objectively reasonable" for the officer to believe his conduct was lawful.  *Gonzalez v. Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (citing *Taravalla v. Town of Wolcott*, 599 F.3d 129, 133–34 (2d Cir. 2010)).

Upon review, the State defendants' motion for summary judgment on the basis of qualified immunity must be denied as premature.  As plaintiff notes, the constitutional rights at stake are "clearly established."  *See, e.g.*, *Kinzer v.*

*Jackson*, 316 F.3d 139, 143 (2d Cir. 2003) (malicious prosecution); *Zahrey*, 221 F.3d at 355 (fabricated-evidence).  Right now, however, there are a series of live disputes over whether one or more of the defendants engaged in conduct that amounted to the violation of one or more of these constitutional rights.  Accordingly, summary judgment on this ground must be denied.

# V.  CONCLUSION

Although the defendants insist that they acted in good faith, a jury could conclude that one or more of them chose to burnish a relatively weak murder case by fabricating material evidence used to obtain probable cause.

Therefore, it is

ORDERED that

1.  The State defendants' motion for summary judgment is GRANTED in part and DENIED in part;

2.  The County defendants' motion for summary judgment is GRANTED in part and DENIED in part;

3.  Defendant Barbara Thayer's motion for summary judgment is GRANTED in part and DENIED in part;

4.  Plaintiff's § 1983 claims alleging a failure to investigate (Count Three), the suppression of evidence (Count Four), supervisory liability (Count Six), and stigma-plus defamation (Count Eight) are DISMISSED;

5.  Plaintiff's claim for emotional distress (Count Ten) is DISMISSED;

6. Defendant Investigator Lester is DISMISSED as a defendant;

7. The Jane/John Does are DISMISSED without prejudice;

8. Tioga County District Attorney's Office is DISMISSED as a defendant;

9. Plaintiff's claims for malicious prosecution under § 1983 and state law (Counts One and Nine) against Senior Investigator Mulvey, Investigator Andersen, and DA Keene REMAIN for trial;

10. Plaintiff's § 1983 fabrication of evidence claim (Count Two) against Senior Investigator Mulvey, Investigator Andersen, DA Keene, and Ms. Thayer REMAIN for trial;

11. Plaintiff's § 1983 conspiracy claim (Count Five) against Senior Investigator Mulvey, DA Keene, and Ms. Thayer REMAIN for trial;

12. Plaintiff's § 1983 municipal liability claim (Count Seven) against the County REMAINS for trial.

The Clerk of the Court is directed to terminate the pending motions and amend the caption accordingly.

IT IS SO ORDERED.

David N. Hurd
U.S. District Judge

Dated:  March 23, 2023
        Utica, New York.